## UNITED STATES of America, Plaintiff,

### v.

## Montonio L. WORKCUFF, Defendant.

### No. 020018901CRWODS.

United States District Court,
W.D. Missouri,
Western Division.

Jan. 31, 2003.

E. Eugene Harrison, Wesley Brent Powell, U.S. Attorney's Office, Kansas City, MO, for USA.

Patrick William Peters, Peters Moore & Jones LLC, Kansas City, MO, for Montonio L Workcuff.

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SMITH, District Judge.

Pending before the Court are (1) Defendant's Objections to the Report and Recommendation of the United States Magistrate Judge[1] Respecting Defendant's Motion to Suppress (Doc. # 64), and (2) the Government's Objections to the Report and Recommendation of the United States Magistrate (Doc. # 66). For the following reasons; the Court adopts the Report and Recommendation ("Report") of the United States Magistrate Judge as the Order of the Court (see attached Exhibit A).

### I. BACKGROUND

Having reviewed the record de novo, the Court adopts the Magistrate Judge's findings of fact. For the sake of clarity, the Court will simply highlight certain facts relevant to its discussion.

On May 28, 2002, Defendant Montonio L. Workcuff's residence was searched and materials were seized. The search warrant was issued by a Judge of the Circuit Court of Jackson County, Missouri. The

---

1. The Honorable Sarah W. Hays.

warrant was based on an Affidavit of Detective Anthony Cooper, who was assigned to the Drug Enforcement Administration ("DEA") as a Task Force Officer and had acquired information regarding Defendant's selling of drugs from Jarvis J. Henderson ("Henderson"). At the time, Henderson was in federal custody resulting from a multi-count federal drug indictment. As part of his plea agreement with the United States, Henderson agreed to provide assistance to the Government relating to drug dealers. During a phone conversation while in custody, Henderson identified Defendant as his lone source of cocaine in 2001. Henderson told Detective Cooper that Defendant resided in a yellow house on the 3400 block of Garfield, and Defendant owned at least two vehicles, a purple Suburban and a blue Tahoe. According to Henderson, Defendant would have furniture delivered to his house that concealed cocaine and marijuana. Detective Cooper corroborated the information by observing a residence matching the description provided by Henderson. In the driveway, the officers identified a blue sport utility vehicle bearing a license plate that was registered to Defendant. Within the Street Narcotics Unit DRAGNET[2] System, Detective Cooper found two complaints of suspected narcotics activity had been reported at Defendant's residence.

When presented with the information about Defendant, Detective Cooper first consulted with an Assistant United States Attorney rather than a Jackson County Prosecutor. Detective Cooper also requested and obtained subpoenas from the United States Attorney's Office to obtain a recording of his phone conversation with Henderson.

Detective Cooper presented his affidavit to a Jackson County Circuit Judge together-

er with a proposed search warrant. Tr. I at 90.[3] The search warrant prepared by Detective Cooper declared "entry into the residence may be made without knocking and embanking the presence of law enforcement due to safety concerns enumerated in the affidavit of the search warrant." Tr. I at 110. Detective Cooper admitted he did not know what "embanking" meant, and he also admitted that nothing in his affidavit indicated a risk to officer safety or destruction of evidence. Tr. I at 110–11. The Jackson County Circuit Judge signed the prepared search warrant.

Prior to entering the residence, the officers announced their presence but did not wait for anyone to respond or answer the door. When the search warrant was executed, at least two officers who were assigned to the DEA Regional and Interdiction Task Forces participated in the search.

On September 25, 2002, Defendant filed a motion to suppress the evidence. In support of his motion, Defendant argued (1) the search was unreasonable under the Fourth Amendment because the officers conducting the search vandalized the residence and a vehicle, which was not listed in the search warrant; (2) the search was without probable cause; (3) the search warrant was a general search warrant; (4) the search was invalid pursuant to section 542.276 of the Missouri Revised Statutes; (5) the search was a no-knock search in violation of federal law; (6) the procedure for searches in Jackson County, Missouri, does not comport with Due Process; (7) the search warrant was not signed by a neutral and detached magistrate; (8) Detective Cooper was not placed under oath by the State; (9) there was a misrepresen-

---

2. DRAGNET stands for Data Research and Analysis for Geographic Narcotics Enforcement Targets.

3. Tr. I refers to the transcript of the hearing held on October 18, 2002.

tation in Detective Cooper's affidavit regarding the license plate number on one of the vehicles; and (10) the Fourth Amendment was violated when a photographer was present during the execution of the search warrant.

In her Report, the Magistrate Judge recommended that the evidence seized in this case be suppressed because the officers improperly conducted a no-knock search. Report & Recommendation 1177. The Magistrate Judge further found: that the destruction of property that occurred during the search was reasonably necessary to effectuate a safe and thorough search and the presence of a photographer during the execution of the search did not violate the Fourth Amendment; the search warrant was signed by a neutral and detached magistrate; there was probable cause for the search warrant, the search warrant was not a general search warrant; there was not a misrepresentation regarding the license plate number; and, the detective was placed under oath when filing his application for the search warrant. Report & Recommendation 1178, 1179 – 1184. Alternatively, the Magistrate Judge found that even if probable cause did not exist for the warrant or if the items listed in the warrant were too general, the *Leon* good faith exception would support the admissibility of the evidence because the officers executing the warrant "were acting in 'objectively reasonable reliance' on a warrant issued by a neutral judge." Report & Recommendation 1184 (quoting *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

On January 8, 2003, Defendant filed objections to the Report and Recommendation, and, on January 27, 2003, Defendant filed his response to the Government's objections to the Report and Recommendation. Defendant's objections to the Report and Recommendation and his response to the Government objections reiterate the arguments he presented to the Magistrate Judge. Additionally, Defendant makes a specific request that the District Court determine the credibility of Detective Cooper, and Defendant proposed additional facts that were not contained in the Magistrate Judge's findings of fact.

On January 10, 2003, the Government filed its objections to the Report and Recommendation, and, on January 22, 2003, the Government filed its responses to Defendant's objections to the Report and Recommendation. The Government argues that the manner of entry by the law enforcement officers did not violate Defendant's Fourth Amendment protections from unreasonable searches and seizures. The Government further argues that the Magistrate Judge's Report and Recommendation is not supported by the facts in the case, it fails to recognize the current law on the subject and it fails to properly apply the law to the facts in the case. In the Government's response to Defendant's objections to the Report and Recommendation, the Government objects to some of Defendant's proposed additional findings of fact, and the Government objects to Defendant's argument that the District Court should determine the credibility of Detective Cooper.

## II. DISCUSSION

■ "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance..." 18 U.S.C. § 3109 (2000). "Section 3109 applies '[w]hen federal officers are a significant part of a search conducted pursuant to a state warrant.'" *United States v. Tavares*, 223 F.3d 911, 914 (8th Cir.2000) (quoting *United States v. Murphy*, 69 F.3d 237, 242 (8th Cir.1995), *cert. denied*, 516 U.S. 1153, 116

S.Ct. 1032, 134 L.Ed.2d 109 (1996)). When determining if there is significant federal involvement, the Court must look at the efforts to obtain the warrant and the execution of the warrant. *Tavares,* 223 F.3d at 915 (citations omitted).

■ Detective Cooper, an officer assigned to the DEA Interdiction Task Force, first received information about Defendant from Jarvis Henderson, a federal prisoner who had agreed to cooperate with the United States Government pursuant to his plea agreement. Detective Cooper, armed with his knowledge about Defendant, contacted the United States Attorney's Office. He further requested subpoenas to be issued from the United States Attorney's office so that the detective could obtain a recording of his conversation with Henderson. When the search warrant was executed, at least two of the officers were assigned to the DEA as Task Force Officers. In fact, during the videotape of search, one officer is seen wearing DEA clothing. The Court agrees with the Magistrate Judge and finds that these facts suggest significant federal involvement in the search.

■ According to section 3109, an officer must first knock and announce his authority and wait until he is refused admittance before he can break down the door. 18 U.S.C. § 3109. The officers who testified at the motion to suppress hearing stated that they did announce their presence, but they did not await an answer before entering the Defendant's house. Officers forced open the door and found the dwelling unoccupied. While the officers' actions are in direct violation of section 3109, exigent circumstances can excuse officers from meeting the requirements of section 3109. *Tavares,* 223 F.3d at 916 (quoting *United States v. Lucht,* 18 F.3d 541, 549 (8th Cir.1994)).

■ Exigent circumstances are present when police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *United States v. Mendoza,* 281 F.3d 712, 718 (8th Cir. 2002) (citations omitted). Officers testifying at the suppression hearing stated that warrants with no-knock provisions are frequently used in drug cases to ensure officer safety and the preservation of evidence. While drug investigations present possible risks to officer safety and the preservation of the evidence, the Supreme Court has held that there is no blanket exception to the knock and announce requirement in drug investigations. *Richards v. Wisconsin,* 520 U.S. 385, 393, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). The affidavit filed to support the search warrant indicated no basis for believing that the officers' safety was at risk or that there was a possibility of evidence destruction. Without more than the fact that this was a narcotics investigation, the Government is unable to point to exigent circumstances in this case. As a result of the officers' violation of the knock and announce rule, the motion to suppress must be granted.

■ Even if there was no significant federal involvement in this case, the no-knock provision in the search warrant was not supported by the affidavit and, therefore, the evidence would still have to be suppressed. The affidavit recited no concerns about officer safety or destruction of evidence, there was no mention of Defendant's propensity to carry weapons, and there was no history of Defendant being violent toward law enforcement officers. In fact, the affidavit actually undermines any argument that evidence might have been destroyed. The affidavit says Defendant often secreted drugs and money in

various places throughout the dwelling. It would have been improbable that widely dispersed evidence could be destroyed in the time required to execute a regular search warrant.

█ When officers conduct themselves in an "objectively reasonable" manner with "a reasonable knowledge of what the law prohibits" while executing a search warrant, the officers may be entitled to the *Leon* good faith exception to the exclusionary rule. *United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Marts,* 986 F.2d 1216, 1219 (8th Cir.1993). The *Tavares* affidavit stated that the no knock provision was necessary because controlled substances can be easily disposed and unidentified suspects may be involved in violent crimes. 223 F.3d at 917. Nevertheless, the Eighth Circuit found that the officers executing the search warrant were not entitled to the *Leon* good faith exception because the affidavit submitted with the request for the search warrant revealed no emergency to justify no-knock entry. *Id.* In this case, there was absolutely no evidence in the affidavit that exigent circumstances existed, and the affidavit offered no justification a no-knock provision. Without exigent circumstances, the search warrant should not have contained a no-knock provision. As a result, the evidence seized must be suppressed.

Having reviewed the record de novo, the Court accepts and adopts the Magistrate Judge's recommendations as to Defendant's remaining objections regarding the actual search warrant and the execution of the search warrant.

### III. CONCLUSION

For the foregoing reasons, the Court rejects Defendant's and the Government's objections and requests for additional findings of fact, and the Court adopts the Magistrate Judge's recommendation as the ruling of this Court.

IT IS SO ORDERED.

### EXHIBIT A

### REPORT AND RECOMMENDATION

HAYS, United States Magistrate Judge.

This matter is currently before the Court on Defendant's Motion to Suppress. For the reasons set forth below, it is recommended that this motion be granted.

### I. INTRODUCTION

On July 10, 2002, the Grand Jury returned a three count indictment against defendant Workcuff. Count One of the indictment charges that from January 2001 to May 28, 2002, defendant conspired with others to possess with intent to distribute and to distribute five kilograms or more of cocaine. Count Two charges that on May 28, 2002, defendant knowingly possessed a .357 caliber revolver in furtherance of the crime of conspiracy to possess with intent to distribute and to distribute cocaine. Count Three seeks forfeiture of property from defendant.

On October 18, 2002, an evidentiary hearing on defendant Workcuff's motion to suppress was begun before the undersigned. Defendant Workcuff was represented by retained counsel Patrick W. Peters. The Government was represented by Assistant United States Attorney E. Eugene Harrison. The Government called Detective Anthony Cooper of the Kansas City, Missouri Police Department as a witness. The defense called no witnesses to testify on October 18, 2002.

The hearing continued on October 29, 2002. The testimony of Detective Cooper was concluded. The Government then called Officer Mark Mosbacher, Officer Charles Bax, Officer Michael Miller, Ser-

geant Paul Hamilton, Officer Daniel Meyer, Officer Brian Templeton, Officer Curtis Schmidt, Detective Steven Espeer and Sergeant Jay Pruetting of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify on October 29, 2002.

The hearing continued on November 13, 2002. The testimony of Sergeant Pruetting was concluded. The defense called Keith Scott and Angela Banks, defendant Workcuff's aunt, to testify.

The hearing continued on November 15, 2002. No testimony was presented on this date.

The hearing continued on December 6, 2002. The defense called Jay DeHardt, an attorney, and defendant Workcuff to testify. The Government recalled Detective Cooper.

The hearing concluded on December 9, 2002. No testimony was presented on this date.

## II. *FINDINGS OF FACT*

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Detective Anthony Cooper testified that he executed a search warrant at Jarvis Henderson's residence which led to his arrest and incarceration. (Tr. I[4] at 15) Detective Cooper believes Henderson was incarcerated in April 2002. (Tr. II[5] at 97) Henderson was indicted on drug trafficking charges and entered into a substantial assistance plea agreement. (Tr. I at 15–16) Detective Cooper testified that during the course of Henderson's incarceration, Cooper had several opportunities to interview Henderson concerning individuals that Henderson had worked with in the narcotics trade. (Tr. I at 15) As part of the plea agreement, Henderson was supposed to cooperate truthfully and provide substantial assistance to the Government relating to the subsequent investigations and arrests of other known drug dealers. (Tr. I at 16) On May 23, 2002, Henderson mentioned Montonio Workcuff to Detective Cooper for the first time. (Tr. II at 5) After talking to Henderson, Detective Cooper spoke with a U.S. Attorney, as opposed to a Jackson County Prosecutor. (Tr. I at 83–84) Detective Cooper testified that he decided to apply for a state search warrant rather than a federal search warrant because that was where he had experience. (Tr. I at 84–85)

2. On May 23, 2002, Detective Cooper presented Judge Margaret L. Sauer with an Affidavit/Application for Search Warrant. (Tr. I at 14; Government's Ex. 1) Judge Sauer read the Affidavit/Application for Search Warrant prior to signing the search warrant. (Tr. I at 104) The Affidavit/Application for Search Warrant was also reviewed by a prosecutor prior to being presented to Judge Sauer. (Tr. I at 91)

3. The Affidavit/Application for Search Warrant, sworn to by Detective Cooper, provides in part:

On 5–23–02, the reporting detective conducted a proffer interview with Jarvis J. Henderson, black male, 1–12–73. Henderson, who is currently in federal custody resulting from a multi count federal drug indictment agreed to meet with the affi-

---

**4.** Tr. I refers to the transcript of the hearing held on October 18, 2002.

**5.** Tr. II refers to the transcript of the hearing held on October 29, 2002.

ant and provide information concerning his association with the sale and distribution of illegal narcotics. Henderson was provided with a kastgar [sic] letter, which was reviewed by his attorney, John Spencer and signed by Henderson.

During the course of the interview Henderson admitted to the affiant he was, until the time of his arrest a powder cocaine drug dealer. He advised that during the year 2001 his lone source of cocaine was a subject known to him as Montonio Workcuff. Henderson advised through a mutual friend he was introduced to Workcuff at his employment at that time, the McDonald's Restaurant located at 64th & Troost. He advised the intent of the introduction was to purchase a pound of marijuana from Workcuff. He advised subsequent transactions occurred and eventually he gained the confidence of Workcuff, whereby he (Henderson) would obtain from Workcuff, eighteen (18) ounces of powdered cocaine at a time. Henderson advised several of these transactions occurred at Workcuff's residence,[6] which Henderson advised was believed to be located on Garfield, possibly in the 3400 block. Henderson described the residence as the second house from the intersection, located on the west side of the street. He advised the residence was yellow in color and had undergone some extensive renovation. Henderson advised that among the renovations, the house has various hidden compartments where Workcuff hides money and drugs. He added Workcuff owns at least two vehicles, described as a purple Suburban and blue Tahoe.

According to Henderson during the middle of 2000, Workcuff advised him he was considering no longer supplying powder cocaine and was going to deal exclusively in the distribution of marijuana. Henderson advised Workcuff had planned on introducing his source of cocaine directly to him, so that Henderson could continue acquiring powder cocaine. Henderson advised that on one occasion, while at Workcuff's residence, he was introduced to an Hispanic male, known only by the first name "Jorge." He advised that during this encounter Workcuff and Jorge were utilizing a money counting machine, which counted out approximately two-hundred thousand dollars.

Henderson learned Jorge delivered drugs from Mexico by the way of Arizona to Workcuff's residence, utilizing Hispanic males occupying a Ryder or a U–Haul truck. Under the assumption Workcuff was taking delivery of new furniture, the Mexican males would deliver furniture to the residence, which had concealed inside, cocaine and marijuana. Henderson advised these deliveries occurred once a month with no regular day of occurrence. He advised that after Workcuff would remove the drugs, the men would take possession of the furniture and reload it into the truck. Henderson added that although he had been introduced to Jorge, he never dealt directly with him and

6. Detective Cooper testified that he intended this phrase to mean that Henderson told him that Henderson would give Workcuff money at Workcuff's house and Workcuff would hand Henderson cocaine at Workcuff's house. (Tr. I at 97)

continued dealing exclusively with Workcuff. Henderson added that at the time of his arrest, in early April of 2002, he had nine-thousand dollars on his person, which were monies he owed to Workcuff from powder cocaine.

Henderson advised while incarcerated in Leavenworth, Kansas on his pending charges, approximately one week ago, he had a telephone conversation with Workcuff. He advised that during the conversation, Workcuff inquired as to whether or not Henderson had told investigators of his (Workcuff's) illegal activity. When advised he hadn't and that he stood a chance of having his charges dismissed, according to Henderson Workcuff informed him that when released, they would pick-up where they left off. Henderson explained to the affiant, this meant he would pay Workcuff twelve-thousand dollars owed to him and that they would resume their narcotics relationship.

On 5-23-2002, the affiant along with Det. Darla Harris responded to the 3400 block of Garfield in an attempt to locate the residence in question. While we were unable to find the described residence in the 3400 block of Garfield, the detectives observed a residence matching the description provided by Henderson in the 3300 block of Garfield. While the detectives were unable to observe a displayed numerical address, the house was noted to have been the second structure south of the intersection of 33rd and Garfield, exactly one structure south of

the residence displaying the numerical address "3300." Among the vehicles observed was a blue sport utility vehicle, bearing Missouri License "289–MS2." A check of the vehicle's license responded back to Montonio Workcuff of 3304 Garfield.

A check in the Street Narcotics Unit DRAGNET System[7] revealed two complaints of suspected narcotics activity taking place at the residence of 3304 Garfield, reported on 6-24-01 and 10-26-01. The reports indicate Montonio Workcuff sells drugs from the residence and that he is employed at McDonald's which is located at 63rd and Troost. Reports went on to state Workcuff keeps drugs concealed throughout various places inside the residence.

(Government's Ex. 1)

4. Detective Cooper testified that subsequent to his interview of Jarvis Henderson, he took steps to corroborate the statements that had been given to him by Henderson. (Tr. I at 17–18) For instance, Detective Cooper sought out the house that Henderson had described during the interview and found a house matching the description given by Henderson in the 3300 block of Garfield. (Tr. I at 18–20) Parked along the south side of that house was a blue sport utility vehicle registered to Montonio Workcuff, 3304 Garfield. (Tr. I at 24) Further, Detective Cooper utilized a database known as the DRAGNET system and determined that two suspected narcotics activity complaints had been registered against the address 3304 Garfield. (Tr. I at 20–21) The com-

---

7. DRAGNET stands for Data Research and Analysis for Geographic Narcotics Enforcement Targets. (Tr. II at 5) Detective Cooper testified that information entered on the DRAGNET system is unverified. (Tr. I at 87)

plaints indicated that Montonio Workcuff sells drugs from the residence and that he is employed at McDonald's which is located at 63rd and Troost. (Tr. I at 22) The reports went on to state that Workcuff keeps drugs concealed throughout various places inside the residence. (Tr. I at 22) Detective Cooper inquired about checking into the telephone conversation between Henderson who was housed at CCA and Workcuff, but was told it would be difficult, if at all possible, to do that. (Tr. I at 82) Nevertheless, subpoenas were served on CCA for this information. (Tr. I at 83) Detective Cooper testified that he could not remember whether these subpoenas were requested prior to or after the search warrant was obtained. (Tr. I at 83)

5. Keith Scott testified that the blue Tahoe parked at 3304 Garfield had mechanical difficulties and was not being driven. (Tr. III[8] at 77) Mr. Scott and Ms. Banks testified that in April the tags were removed from the blue Tahoe and placed on another vehicle belonging to a man named Raman, also known as Fat Boy. (Tr. III at 78,

84–86) Defendant Workcuff testified that the Tahoe broke down around the beginning or middle of April and that he allowed his friend Raman to remove the tags from the Tahoe about a week after it broke down and use them on his vehicle. (Tr. V[9] at 45–46) According to Workcuff, the tags were still on Raman's vehicle on May 23 and May 28, 2002. (Tr. V at 45–46) On June 11, 2002, Raman's girlfriend was ticketed for driving with truck tags on a car, that is Missouri License "289–MS2." (Tr. III at 79, 81–82) Detective Cooper testified that he did not place any false information in the affidavit nor did he leave out any information. (Tr. I at 28)

6. The search warrant authorized the officers to seize the following items:

Cocaine, a Schedule II Controlled Substance;[10]

Marijuana, a Schedule I Controlled Substance;[11]

Any weapons;[12]

Currency;[13]

Any and all equipment used to further drug transactions and/or deter law enforcement effectiveness;[14]

---

8. Tr. III refers to the transcript of the hearing held on November 13, 2002.

9. Tr. V refers to the transcript of the hearing held on December 6, 2002.

10. Detective Cooper testified that Henderson talked about seeing cocaine in the house during the year 2001, somewhere between six and eighteen months prior to the application for search warrant. (Tr. I at 99)

11. Detective Cooper testified that there is nothing in the affidavit regarding marijuana being seen in the house. (Tr. I at 99–100)

12. Detective Cooper testified that there is nothing in the affidavit regarding any weapons. (Tr. I at 100)

13. Detective Cooper testified that there is nothing in the affidavit regarding currency being in the house other than the statement that currency was used with a currency machine sometime in the year 2000. (Tr. I at 100) However, Detective Cooper further testified that it has been his experience that drug trafficking is a cash business. (Tr. II at 104)

14. Detective Cooper testified that individual officers determine whether in their opinion a particular item can be used to further drug transactions and/or deter law enforcement effectiveness. (Tr. I at 102)

 

Any papers, correspondence or documents related to drug trafficking and/or the disposition of moneys which evidence the proceeds from the illicit trafficking of drugs;[15]

Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, of assets, and/or controlled dangerous substances;[16]

Indicia of occupancy, residency, ownership, management and/or control of the premises described above including, but not limited to utility and telephone bills, canceled envelopes and keys;

Any and all equipment used to deter the effectiveness of law enforcement and their attempts to halt the sale/distribution/manufacture of controlled substances.

(Government's Ex. 1)

7. The search warrant further provided:

NOW THEREFORE, IN THE NAME OF THE STATE OF MISSOURI, I command that you search the ... place ... above described within 10 days after filing of the Application for issuance of this Warrant, by day or night, as soon as practicable, and to take with you, if need be, the power of your county, and, if said above described property, or any part thereof, be found on said ... place ... that said property be seized or photographed, or copied and returned, or the photograph or copy, be brought to the Judge, who issued the Warrant to be dealt with accordingly to law.

Furthermore, entry into the residence may be made without knocking and embanking the presence of law enforcement and their purpose due to safety concerns enumerated in the affidavit of the search warrant.[17] That you make a complete and accurate inventory of the property so taken by you in the presence of the person from whose possession the same is taken, if that be possible, and to give to such person a Receipt for such property, together with a copy of the Warrant, or, if no person can be found in possession of said property, leaving said Receipt and copy of said Warrant at the sight of the search. After execution of the Search Warrant, the Warrant with a Return thereon, signed by the officer making the search, shall be delivered to the Judge who issued the Warrant, together with an itemized Receipt for said property taken.

(Government's Ex. 1)

8. Detective Cooper obtained the search warrant on May 23, 2002, but did not execute it on that day. (Tr. I at 98) The warrant was executed on May 28, 2002. (Tr. I at 13) The reason for the delay was the availability of a tactical squad to execute the warrant. (Tr. I at 98–99) Prior to entry

---

**15.** Detective Cooper testified that there is nothing in the affidavit which would indicate that Workcuff would have notes. (Tr. I at 102)

**16.** Detective Cooper testified that there is nothing in the affidavit about photographs. (Tr. I at 103)

**17.** Detective Cooper testified that there is nothing in the affidavit that talks about safety concerns. (Tr. I at 111)

into the residence, Officer Meyer announced, "Police. Search Warrant." (Tr. II at 128–129) The officers did not wait for anyone to answer the door. (Tr. II at 134, 143–44, 169) The purpose of the announcement is that if someone is inside and hears the door break, they know it is the police. (Tr. II at 133, 143) The officers characterized the entry as a no-knock entry. (Tr. II at 142–43, 169) Upon entry, the tactical squad detonated flash bangs, distraction devices. (Tr. I at 121) No one was present in the house. (Tr. II at 130) Officer Mosbacher testified that he has participated in over, a thousand entries on search warrants. (Tr. II at 124) In Officer Mosbacher's experience, the majority of the search warrants dealing with narcotics have been no-knock warrants. (Tr. II at 126) Officer Mosbacher testified that no-knock warrants are used to ensure the safety of the officers because, due to the nature of the narcotics trade, residences are commonly fortified with weapons. (Tr. II at 126) Sergeant Pruetting, the officer in charge of the search team, testified that he anticipates that officers might encounter firearms when they execute a search warrant on a residence believed to be associated with drug trafficking. (Tr. III at 57) No-knock warrants are also used so that evidence is not destroyed by a person notified of the officers' presence. (Tr. II at 126)

9. Detective Cooper maintained perimeter security while the tactical squad made entry into the residence. (Tr. I at 37) For safety reasons, Detective Cooper opened the doors of the vehicle parked along the south side of the house to ensure that no one was inside the vehicle. (Tr. I at 37) The vehicle parked along the south side of the house was the blue sport utility vehicle registered to Montonio Workcuff which Detective Cooper had observed when he was attempting to verify Jarvis Henderson's information. (Tr. I at 37) Detective Cooper then directed his attention to the residence to ensure that no one was escaping or trying to enter the house. (Tr. I at 37–38) After the tactical squad advised that the residence was secure, Detective Cooper redirected his attention to the vehicle and began looking inside it. (Tr. I at 38) Detective Cooper looked inside the glove box and in compartments within the glove box. (Tr. I at 117) The car alarm was disassembled because it was going off. (Tr. I at 118) Sergeant Pruetting testified that it was inappropriate to search something not contained in the search warrant. (Tr. III at 36) Defendant Workcuff testified that prior to the search, the Tahoe had no damage to the interior nor any damage under the hood. (Tr. V at 46) According to Workcuff, after the search, there were wires cut under the hood that had nothing to do with the car alarm, wires were cut in the interior of the Tahoe, the glove box was sitting in the seat, the carpet was ripped up, trim around a TV/radio was broken and the speakers in the back seat were kicked in. (Tr. V at 47–48) Detective Cooper testified that he did not pull up the carpet in the vehicle nor did he pull out the dash as represented in the photograph shown to him by defense counsel. (Tr. I at 118)

10. Detective Cooper entered the house with the supervisor in charge of tactical entry who pointed out things to Detective Cooper that he thought would be of evidentiary value. (Tr. I at 38) Detective Cooper then delegated assignments to his squad as to who was going to search which specific

area in the house. (Tr. I at 38) A videotape of the premises was made at this time as part of police operations in the execution of the search warrant. (Tr. I at 48, 51–52; Government's Ex. V–1) Pictured in the videotape is an officer wearing a DEA jacket who is referred to as Detective Phillips (but whose face is not clearly visible).[18] (Government's Ex. V–1)

11. Detective Cooper testified that he did not break anything during his search of the residence nor did he observe other officers break anything. (Tr. I at 42, 44) A revolver was found inside a bag of powder concrete in the basement. (Tr. I at 44–45) After the revolver was found, the contents of the bag were poured out to see if anything else was hidden in the bag. (Tr. I at 45) Open paint cans found in the basement were also searched to see if anything was hidden inside of them. (Tr. I at 45) The paint was poured on the floor because the officer did not have another bucket to pour it in. (Tr. III at 46) Officers removed a television set that was built into a bedroom wall because contraband and/or guns could have been concealed behind the television. (Tr. I at 46) A two foot square section of a wall was removed because there was a pre-existing cut in the wall which drew the officers' attention to the wall. (Tr. I at 46–47) Detective Cooper testified that it is a common concealment method to cut out a portion of a wall and then place furniture in front of that area. (Tr. I at 47)

12. Beneath an air conditioning unit outside the house, the officers found ammunition for a handgun. (Tr. I at 44) The furnace in the basement was disassembled because officers, including Detective Cooper, have been successful in the past in retrieving contraband from furnaces. (Tr. II at 48–51)

13. Detective Cooper testified that zippered cushions were opened and the foam removed to determine if anything was concealed within the cushions. (Tr. II at 31) Detective Cooper testified that drug dealers commonly conceal drugs and/or currency in cushions. (Tr. II at 31) The factory-sealed liner of the sofa was cut open. (Tr. II at 35) Detective Cooper had received specific information from Jarvis Henderson that defendant Workcuff took delivery of furniture that had narcotics concealed within it. (Tr. II at 35)

14. Detective Cooper testified that officers remove drawers when they are conducting a search. (Tr. II at 41) They look in areas where drugs are not readily noticeable but are commonly concealed. (Tr. II at 41) It would not be out of the ordinary for a room to not be in the exact condition it was in prior to the officers going in and searching. (Tr. II at 41) Sergeant Pruetting testified that to conduct a thorough search of a residence, it is reasonable for officers to open containers in the kitchen and dump the contents on the floor because narcotics are often hidden in cereal boxes, in spices and in other containers. (Tr. III at 43)

15. The search lasted approximately an hour to an hour and one-half. (Tr.

---

**18.** Detective Fred Phillips, a detective with the Kansas City, Missouri Police Department who is assigned to the DEA Regional Task Force, has testified before this Court in other cases. The Court assumes that the Detective Phillips pictured in the videotape and Detective Fred Phillips are the same person.

I at 43) Detective Cooper testified that in his opinion, there was no vandalism done to the property during the course of the search warrant. (Tr. I at 47) Sergeant Pruetting testified that he did not observe anything being maliciously damaged or destroyed during the search. (Tr. II at 205–06) Sergeant Pruetting called in Sergeant Arndt, who is in charge of the interdiction squad, because he has a density meter which can detect masses behind walls. (Tr. II at 208) The density meter was used so that the officers would not needlessly destroy walls in the house. (Tr. II at 208)

16. Angela Banks testified that she arrived at her nephew's house after the search had started. (Tr. III at 98) Ms. Banks watched the officers from a neighbor's porch across the street from defendant's house. (Tr. III at 99) Ms. Banks went into the house after the officers left. (Tr. III at 105) According to Ms. Banks, the house was completely destroyed. (Tr. III at 105)

17. The purpose of a Return/Receipt for Search Warrant is to leave a receipt for items removed from a residence with the occupant of the residence. (Tr. I at 52) The Return/Receipt for Search Warrant lists the following property as having been seized:

1. paperwork
2. photos

3. US Currency (approximately $10　　) Released to Det. Espeer.[19]
4. green leafy
5. purse
6. 3 shoeboxes
7. checkbooks
8. scales [20]
9. magazine & ammo
10. body armour [sic]
11. Ruger 357 revolver, serial # 571.60569
12. bags

(Government's Ex. 4)

18. Detective Cooper provided the following explanation for Item # 3 of the Return/ Receipt for Search Warrant, i.e. "US Currency (approximately $10　　) Released to Det. Espeer:"

When we got inside of the house and saw that there was an extensive amount of U.S. currency, we made the determination that we probably would not obtain an accurate count of the amount of currency without utilizing some sort of equipment in order to do that. So, based on that what we did was we took a random sample of one of the bundled monies, I believe from each box and the purse and then based on that, tried to calculate how much money we believed was actually inside there. Then the determination was made that that probably wouldn't be an accurate account. So, we decided to call Detective Espeer. At that time [Detective Darla Harris]

19. The actual amount of currency recovered was $103,661. (Tr. II at 188) Defendant Workcuff testified that he had $109,750 in cash in his house. (Tr. V at 44)

20. Defendant Workcuff testified that the scales found in a vehicle on his property were old scales that had been present in the residence when he purchased it. (Tr. V at 49–51) Workcuff wanted them out of his house because he knew that scales were associated with illegal drugs. (Tr. V at 60)

had made the notation. I directed her ... to put approximately $100,000 there because that was what we got based on the sample rough count. She made the notation, started doing that and then was directed not to do that until Detective Espeer actually obtained the money and did a more accurate specific count.

(Tr. I at 54)

19. Detective Cooper signed the Return/Receipt for Search Warrant before a notary and returned it to the Jackson County Criminal Records Division on June 3 or June 5, 2002. (Tr. II at 68–69, 85–89)

20. Detective Cooper testified that he has applied for five or six search warrants in front of Judge Sauer. (Tr. I at 93) Judge Sauer has never crossed out any of the items on the search warrants presented to her by Detective Cooper. (Tr. I at 93)

21. Defense counsel subpoenaed search warrant information from the state court and provided the Court with the following summary:

Two hundred sixty seven individual applications, search warrants and return packets for search warrants signed by Judge Sauer from January to July were scanned into the computer for analysis. In addition, warrants signed by other judges were evaluated.

Details concerning the 267 search warrants reviewed and signed by Judge Sauer include:

| | |
|---|---|
| No knock search warrants issued: | 185 |
| No knock due to safety concerns enumerated in the application | 130 |
| Search warrants that contain the language "knocking and embanking" | 30 |

Categories contained in search warrants:

| | |
|---|---|
| "Indicia of occupancy" | 211 |
| "Any papers, correspondence or documents" | 212 |
| "documents" | 14 |
| "Narcotics paraphernalia" | 173 |
| "Photographs" | 90 |
| "Any weapons" | 152 |
| "Any firearms" | 62 |
| "Trace evidence" (usually used in search following homicide) | 26 |
| "Currency" or "U.S. Currency" | 217 |
| "Any and all equipment used to further drug transactions ..." | 61 |
| "Records, including audio tapes ..." | 21 |
| "Any items used in the preparation, packaging or distribution of narcotics" | 173 |
| "Any and all equipment used to deter the effectiveness of law enforcement" | 23 |
| "Computer hardware consisting of ..." | 17 |
| "Camera" or "Cameras" | 25 |

Number of instances where DRAGNET used in application:

| | |
|---|---|
| DRAGNET | 51 |
| D.R.A.G.N.E.T. | 9 |

Mention of item to be searched for in application:

| | |
|---|---|
| Indicia of occupancy | 0 |
| Papers or documents | 0 |
| Photographs | 0 |
| Computer equipment | 0 |
| Cameras | 0 |

| | |
|---|---|
| Number of warrants in which Judge Sauer struck language in warrant as to items to be searched for | 0 |
| Number of warrants another judge striking language in warrant as to the items to be searched for | 3 |

(Defendant's Ex. 30)

## III. *DISCUSSION*

Defendant Workcuff seeks to suppress evidence seized on May 28, 2002, from his residence at 3304 Garfield.[21] In support of his motion, defendant argues:

---

**21.** While defendant states on the first page of his motion that he "moves to suppress evidence and statements," the remainder of the motion references only the suppression of evidence. Further, no evidence was presented at the hearing that the defendant made any statements. Therefore, the Court will treat defendant's motion as seeking only the suppression of evidence.

1. the search was unreasonable under the Fourth Amendment in that the officers conducting the search vandalized the residence and a vehicle not contained in the search warrant;

2. the search warrant was without probable cause;

3. the search warrant was a general search warrant;

4. the search warrant is invalid pursuant to section 542.276 RSMo;

5. the search was a no-knock search in violation of federal law;

6. the procedures for searches in Jackson County, Missouri do not comport with due process; and

7. the search warrant was not signed by a neutral and detached magistrate.

(Defendant's Motion to Suppress at 2) Defendant raised three additional arguments at the hearing held on November 13, 2002, and memorialized these arguments in an amendment filed on December 10, 2002.

8. Detective Cooper was not placed under oath by Judge Sauer;

9. there was a misrepresentation regarding the license plate number being observed on May 23, 2002; and

10. the Fourth Amendment was violated when a reporter/photographer was allowed into defendant's home.

(Tr. III at 3; Motion to Amend Defendant's Motion to Suppress at 1–2)

The Court finds that evidence seized in this case must be suppressed based on the Court's finding that the officers improperly conducted a no-knock search. While suppression on this basis would in effect moot all of defendant's remaining arguments, the Court will discuss each of defendant's arguments to the extent that the district court is not persuaded by this Court's recommendation with respect to the no-knock issue.

A. *No–Knock Search*

Defendant sets forth the following as support for his argument that evidence seized should be suppressed because the officers conducted a no-knock search:

> The officers conducted a no-knock entry in violation of 18 USCA § 3109. As is discussed more fully under "Neutral Magistrate," Judge Sauer signed a no-knock search apparently without either reading the search warrant or the affidavit or both, as there was no evidence to suggest a no-knock search was warranted.

> The application for search warrant is devoid of any indication that exigent circumstances existed or that safety of the officers was a concern.

(Defendant's Motion to Suppress at 11)

Federal law does not provide for no-knock provisions in search warrants. Rather, the statute entitled "Breaking doors or windows for entry or exit" states:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109. While there is no statute in Missouri expressly authorizing no-knock search warrants, the courts have outlined the standard for no-knock entries:

> In order to justify a "no knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would allow the destruction of evidence. This standard, as opposed to a probable cause requirement, strikes the appropriate balance between the legitimate law enforcement concerns at

issue in the execution of search warrants and the individual privacy interests affected by no-knock entries. This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged.

*State v. Ricketts,* 981 S.W.2d 657, 660 (Mo. Ct.App.1998) (citations omitted).

"Section 3109 applies '[w]hen federal officers are a significant part of a search conducted pursuant to a state warrant . . . .'" *United States v. Tavares,* 223 F.3d 911, 914 (8th Cir.2000)(quoting *United States v. Murphy,* 69 F.3d 237, 242 (8th Cir.1995), *cert. denied,* 516 U.S. 1153, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996)). Detective Cooper, the detective who applied for the search warrant, was assigned to the Drug Enforcement Administration as a Task Force Officer when he began working this case. (*See* Affidavit attached to Criminal Complaint which states: "As of May 20, 2002, I am now assigned to the Drug Enforcement Administration as a Task Force Officer.") Prior to applying for the search warrant in the instant case, Detective Cooper was working on the case of Jarvis Henderson, the informant in this case, who was in federal custody resulting from a multi-count federal drug indictment. (*See* Fact No. 3, *supra*) Detective Cooper testified that he originally went to a U.S. Attorney, as opposed to a Jackson County Prosecutor. (*See* Fact No. 1, *supra*) The videotape admitted in this case, which was made shortly after the tactical unit had deemed the house safe and Detective Cooper had delegated assignments to his squad as to who was going to search which specific area in the house, shows an officer in a DEA jacket who the Court believes to be Detective Fred Phillips, a detective with the Kansas City, Missouri Police Department who is assigned to the DEA Regional Task Force. (*See* Fact No.

10, *supra*) These facts suggest significant federal involvement in the search.

The next step in a section 3109 analysis is to determine whether the statute has been violated. The tactical squad officers who testified at the hearing all indicated that while there was an announcement of "Police. Search Warrant." prior to ramming the door, they did not wait for anyone to answer the door. (*See* Fact No. 8, *supra*) The officers characterized the entry as a no-knock entry. (*See* Fact No. 8, *supra*) Exigent circumstances can excuse officers executing a search warrant from meeting the requirements of section 3109. *See United States v. Tavares,* 223 F.3d 911, 916 (8th Cir.2000). However, "[t]here must be particular facts establishing 'an urgent need to force entry [,which] . . . may result from danger to the safety of the entering officers or from the imminent destruction of evidence.'" *Id.* (quoting *United States v. Lucht,* 18 F.3d 541, 549 (8th Cir.), *cert. denied,* 513 U.S. 949, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994)).

Officers testified at the hearing that no-knock warrants are commonly used to ensure the safety of officers because drug house are often fortified with weapons. (*See* Fact No. 8, *supra*) Further, officers testified that no-knock warrants are used so that evidence is not destroyed by a person notified of the officers' presence. (*See* Fact No. 8, *supra*) However, there is no blanket exception to the knock and announce requirement in drug investigations. The Supreme Court has recently stated:

[W]hile drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree. For example, a search could be conducted at a time when the only individuals present in a residence have no connection with

the drug activity and thus will be unlikely to threaten officers or destroy evidence. Or the police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly. In those situations, the asserted governmental interests in preserving evidence and maintaining safety may not outweigh the individual privacy interests intruded upon by a no-knock entry.

*Richards v. Wisconsin*, 520 U.S. 385, 393, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). The Government must point to exigent circumstances peculiar to the case to excuse the requirements set forth in section 3109. *See United States v. Tavares*, 223 F.3d 911, 917 (8th Cir.2000)(no safety exigency to excuse the requirements set forth in section 3109 when affiant for search warrant did not have any information that defendant was known to use weapons, that he was armed or carried a weapon or that he had a history of violence toward law enforcement officers). The affidavit in support of the search warrant in this case does not even mention weapons or the potential for destruction of evidence. (*See* Fact Nos. 3 and 6 n. 9) The Government has failed to show any exigent circumstances in this case.

Even if the Court found that there was no federal involvement in this case and section 3109 was, therefore, not at issue, the evidence would still need to be suppressed because the no-knock provision of the search warrant was not supported by the affidavit. As Detective Cooper admitted at the hearing, there is nothing in the affidavit that talks about safety concerns. (*See* Fact No. 7 n. 14, *supra*) Likewise, there is nothing in the affidavit which talks about a concern for the destruction of evidence. (*See* Fact No. 3, *supra*) The search warrant should not have contained a no-knock provision as there was no evidence presented to Judge Sauer to support the provision.

In *United States v. Tavares*, 223 F.3d 911 (8th Cir.2000), the Eighth Circuit provided guidance with respect to the availability of the *Leon* good faith exception in the context of a warrant which appears on its face to authorize a no-knock entry:

Finally, we must determine if the officers relied in good faith on the provision in the search warrant authorizing a no-knock entry in the Tavares home. *See United States v. Leon*, 468 U.S. 897, 922–23 ... [104 S.Ct. 3405, 82 L.Ed.2d 677] (1984)(establishing good faith exception to the exclusionary rule in the Fourth Amendment context); *United States v. Marts*, 986 F.2d 1216, 1218–19 (8th Cir.1993)(applying *Leon* in the section 3109 context). This exception to the exclusionary rule requires that the officers executing the warrant conduct themselves in an "objectively reasonable" manner and with "a reasonable knowledge of what the law prohibits." *Marts*, 986 F.2d at 1219 (internal quotations omitted).

The warrant in the case at bar contained a "no knock" provision, which stated that the executing officers need not knock and announce their presence before entering the Tavares home. In the application and supporting affidavit, [the officer] stated that the "no knock" provision was necessary for two reasons-controlled substances are easily disposed of, and unidentified suspects might be involved in violent crimes. However, ... there has been no evidence presented to support the presence of either exigency.

... As did the officers in *Marts*, the officers in the instant case "clear[ly] violat[ed] ... the knock and announce rule, without the presence of exigent circumstances." 986 F.2d at 1219. Therefore,

the executing officers do not benefit from *Leon*'s good faith exception, and Tavares's motion to suppress should have been granted by the district court. 223 F.3d at 917–18. In the case before this Court, Detective Cooper's affidavit did not provide any reasons as to why a no-knock provision was necessary. Detective Cooper and the other officers could not have reasonably relied upon the warrant as justifying a no-knock entry. Pursuant to the *Tavares* case, Detective Cooper and the other officers cannot benefit from the *Leon* good faith exception. The evidence seized as a result of the search must be suppressed.

### B. Other Arguments Relating To The Execution Of The Search Warrant

Defendant makes two additional arguments with respect to problems associated with the execution of the warrant, that is the search was unreasonable under the Fourth Amendment in that the officers conducting the search vandalized the residence and a vehicle not contained in the search warrant and the Fourth Amendment was violated when a reporter/photographer was allowed into defendant's home. The Court will discuss these "execution" arguments.

### 1. Reasonableness Of Search

Defendant sets forth the following as support for his argument that evidence seized should be suppressed because the search was unreasonable:

The wholesale destruction and vandalism committed by the officers executing the search warrant cannot withstand scrutiny under the 4th Amendment. Ignoring, for the moment, the gross deficiencies in the application for, execution and return of the search warrant, the conduct of the officers shocks the conscience. That the Government condones such vandalism by attempting to utilize

at trial items seized during the vandalism is disconcerting.

Counsel has found no reported case where the police, in conducting a search, systematically vandalized a residence. Counsel simply cites the 4th Amendment of the United States Constitution and Article 1 Section 15 of the Missouri Constitution. Both prohibit "unreasonable" searches and, if the search in the instant case doesn't epitomize "unreasonable" then the word and constitutions have no meaning.

The purpose of the exclusionary rule is to deter illegal conduct of officers. If, in executing a search warrant, law enforcement officers systematically vandalize property, the evidence must be excluded. "To break and enter, to engage in unauthorized and unreasonable searches, to destroy all the rights to privacy in an effort to uproot crime may suit the purposes of despotic power, but those methods cannot abide the pure atmosphere of a free society." *Harris v. U.S.*, 331 U.S. 145, 67 S.Ct. 1098, 1117, 91 L.Ed. 1399 (1947). "If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments." *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984).

(Defendant's Motion to Suppress at 6–7)

 As set forth in *United States v. Becker*, 929 F.2d 442, 446 (9th Cir.), *cert. denied*, 502 U.S. 862, 112 S.Ct. 183, 116 L.Ed.2d 145 (1991), a warranted search is unreasonable if it exceeds in intensity the terms of the warrant. The question of unreasonable intensity is resolved by reviewing the facts and circumstances of each case:

It is plain that while the destruction of property in carrying out a search is not favored, it does not necessarily violate the fourth amendment. *Tarpley v. Greene,* 684 F.2d 1, 9 (D.C.Cir.1982). "[O]fficers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 ... (1979). The standard is reasonableness; "destruction of property that is not reasonably necessary to effectively execute a search warrant may violate the Fourth Amendment." *Tarpley,* 684 F.2d at 9.

Whether a search is unreasonable because of its intolerable intensity must be determined by the particular facts of each case.

*Becker,* 929 F.2d at 446.

After examining the facts and circumstances of this case, the Court concludes that the manner of the search, while it may have resulted in some destruction of property, did not render it unreasonable. Before applying for the search warrant, Detective Cooper obtained information from Jarvis Henderson that defendant Workcuff's residence had undergone extensive renovations which included various hidden compartments wherein Workcuff hides money and drugs. (*See* Fact No. 3, *supra*) Henderson had also advised Detective Cooper that under the guise that Workcuff is taking delivery of new furniture, Mexican males deliver furniture to Workcuff's residence which furniture has concealed within it cocaine and marijuana. (*See* Fact Nos. 3 and 13, *supra.*) Finally, Detective Cooper had two DRAGNET reports which indicated that Workcuff kept drugs concealed throughout various places inside his residence. (*See* Fact No. 3, *supra*) Upon entry, the tactical squad detonated flash bangs, distraction devices, which caused some damage to the floor.

(*See* Fact No. 8, *supra*) Sergeant Pruetting testified that he anticipates that officers might encounter firearms when they execute a search warrant on a residence believed to be associated with drug trafficking. (*See* Fact No. 8, *supra*) During the execution of the search, the officers discovered a revolver concealed within a bag of powder concrete. (*See* Fact No. 11, *supra*) The officers removed a television set that was built into a bedroom wall because contraband and/or guns could have been concealed behind the television. (*See* Fact No. 11, *supra*) A two foot square section of a wall was removed because there was a pre-existing cut in the wall which drew the officers' attention to the wall as it is a common concealment method to cut out a portion of a wall and then place furniture in front of that area. (*See* Fact No. 11, *supra*) Beneath an air conditioning unit outside the house, the officers found ammunition for a handgun. (*See* Fact No. 12, *supra*) The furnace in the basement was disassembled because officers have been successful in the past in retrieving contraband from furnaces. (*See* Fact No. 12, *supra*) There was testimony that narcotics are often hidden in cereal boxes, in spices and in other containers. (*See* Fact No. 14, *supra*) Detective Cooper and Sergeant Pruetting testified that they did not observe anything being maliciously damaged or destroyed during the search. (*See* Fact No. 15, *supra*) Sergeant Pruetting called for a density meter which can detect masses behind walls so that the officers would not needlessly destroy walls in the residence. (*See* Fact No. 15, *supra*)

As for the damage allegedly done to the Tahoe, Detective Cooper testified that the car alarm was disassembled because it was going off. (*See* Fact No. 9, *supra*) Detective Cooper had opened the doors of the vehicle to ensure that no one was inside the vehicle during the execution of the

search warrant. (*See* Fact No. 9, *supra*) Detective Cooper further testified that he did not pull up the carpet in the vehicle nor did he pull out the dash as represented in the photograph shown to him by defense counsel. (*See* Fact No. 9, *supra*) Given the evidence before the Court, it appears that the damage to the vehicle may have occurred subsequent to the execution of the search warrant.

The officers had ample reason to believe that illegal narcotics were concealed within the residence. The destruction of property that may have occurred in this case was reasonably necessary to effectuate a safe and thorough search.

### 2. *Reporter/Photographer Present During Execution Of Search*

■ Defendant cites the Court to *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), for the proposition that bringing reporters into a home during the execution of a warrant violates the Fourth Amendment. (Defendant's Response to Government's Response to Workcuff's Exhibit 28 at 36)

The Court does not find the *Wilson* case pertinent to the issues before this Court. *Wilson* was a civil action brought against law enforcement officers. It did not deal with the suppression of evidence. In fact, the Court stated: "Even though such actions might violate the Fourth Amendment, if the police are lawfully present, the violation of the Fourth Amendment is the presence of the media and not the presence of the police in the home. We have no occasion here to decide whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives." *Wilson,* 526 U.S. at 614 n. 2, 119 S.Ct. 1692. *See also United States v. Hendrixson,* 234 F.3d 494, 496 (11th Cir. 2000), *cert. denied,* 534 U.S. 955, 122 S.Ct. 356, 151 L.Ed.2d 269 (2001)("to us, *Wil-*

*son's* footnote suggests that evidence obtained by the police when the media is just present is not subject to the exclusionary rule, while it may remain an open question about whether evidence obtained by the media is subject to the exclusionary rule").

Defendant has provided no authority to support his argument that evidence should be suppressed because a photographer/reporter was present during the execution of the search warrant. Therefore, this argument must fail.

### C. *The Search Warrant*

The United States Supreme Court has set forth the following with respect to what is required for a valid search warrant:

> The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ... [T]his Court has interpreted [these words] to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. Finally, "warrants must particularly describe the 'things to be seized,' " as well as the place to be searched.

*Dalia v. United States,* 441 U.S. 238, 255, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (citations omitted).

Several of defendant's arguments go to alleged deficiencies in Detective Cooper's Affidavit/Application for Search Warrant and in the Search Warrant Detective Cooper obtained from Judge Sauer. For instance, defendant argues the search warrant was without probable cause, the search warrant was a general search war-

rant, the search warrant was not signed by a neutral and detached magistrate, Detective Cooper was not placed under oath by Judge Sauer and there was a misrepresentation regarding the license plate number being observed on May 23, 2002. The Court will discuss the "search warrant" arguments first.

### 1. *Neutral Magistrate*

■ With respect to defendant's allegation that the search warrant was not signed by a neutral and detached magistrate, defendant sets forth the following argument:

> The 4th Amendment requires a showing of probable cause before a neutral and detached magistrate. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 13–14 . . . [, 68 S.Ct. 367, 92 L.Ed. 436] (1948). The search warrant was signed by Associate Judge Margaret Sauer.

If one looks at the application for search warrant and the search warrant signed, it is clear that Judge Sauer either did not read the application or did not read the search warrant (or both). This is not an instance where reasonable judges could differ on whether sufficient information was provided for probable cause. As stated *infra*, in No Probable Cause, Judge Sauer issued a search warrant for items that were not mentioned or suggested in the application. For example, the Judge authorized a search

for "weapons" when the application did not mention weapons in any fashion. A blanket search for photographs, without limitation, was authorized when photographs were not mentioned in the application. Perhaps most telling, the Judge authorized a no-knock search "due to safety concerns enumerated in the affidavit of the search warrant" when no safety concerns were enumerated.

In addition, Judge Sauer commands the officers to seize property and make a complete and accurate inventory and bring both the property seized and the inventory to the judge at the conclusion of the search, yet that was not done. (Defendant's Motion to Suppress at 12–13)

Defense counsel has attempted to prove that Judge Sauer acted as a "rubber stamp" by subpoenaing search warrant information from the state court. Counsel has provided the Court with a summary of various items which listing is set forth at Fact No. 21, *supra.* Contrary to defendant's argument, the summary provided to the Court does not convince the Court that Judge Sauer abandoned her neutral and detached position or acted as a rubber stamp. Rather, the summary merely shows that the judge did not feel the need to strike language in the warrants presented to her. While defense counsel would interpret this to mean that the judge was not diligent in her duties, an equally valid assumption would be that the warrants presented to the judge did not need to be revised. The Court is not in a position to assess the 267 search warrants signed by Judge Sauer from January to July, 2002, and determine whether, in this Court's opinion, any of these warrants should not have been signed.

### 2. *Probable Cause*

■ Defendant sets forth the following as support for his argument that evidence

seized should be suppressed because there was no probable cause for the search warrant:

> There is no suggestion that Jarvis Henderson is reliable, he provides no corroborative information, and the paucity of information he does provide is meaningless. Henderson describes a house in the general terms one might have if he had simply driven past the house. In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 1379, 146 L.Ed.2d 254 (2000), the Court noted that "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."

> The affidavit is silent on any indication that Cooper has dealt with Henderson, or that Henderson has given reliable information in the past. Indeed, the only fact mentioned by Cooper regarding Henderson is that the interview was conducted in the hope of a reduced sentence, which warrants a cautionary instruction on credibility before a jury.

> The affidavit does not mention marijuana in the house in any fashion, yet Judge Sauer signs a search warrant for "Marijuana." There is no probable cause.

> The affidavit does not mention guns or weapons in any fashion, yet Judge Sauer signs a search warrant for "Any weapons." There is no probable cause.

> The affidavit mentions currency viewed in the house sometime in the year 2000, eighteen to thirty months prior to the application for search warrant, yet Judge Sauer signs a search warrant for "Currency." There is no probable cause.

> The affidavit does not mention any papers, correspondence or documents relating to drug trafficking, yet Judge Sauer signs a search warrant for same. There is no probable cause.

> The affidavit does not mention any photographs, yet Judge Sauer signs a search warrant for any "Photographs." There is no probable cause.

> The affidavit does not mention any indicia of occupancy, yet Judge Sauer signs a search warrant for same. There is no probable cause.

> The affidavit does not mention any equipment used to deter the effectiveness of law enforcement, yet Judge Sauer signs a search warrant for same. There is no probable cause.

> The affidavit does mention cocaine, and provides uncorroborated information from an unreliable source that sometime in the year 2001 "several of these transactions occurred at Workcuff's residence." The affidavit does not state whether cocaine was ever purportedly seen in the residence, only that the transaction took place there. There is no probable cause.

(Defendant's Motion to Suppress at 7–8)

The Supreme Court has recognized that, because of the Constitution's "strong preference for searches" conducted pursuant to a warrant, an issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The Court went on to state:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit

before [it], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for … concluding" that probable cause existed. *Id.* at 238–39, 103 S.Ct. 2317.

Defendant's argument that all evidence must be suppressed because the affidavit did not state sufficient probable cause must fail. Detective Cooper's affidavit (which is set forth at Fact No. 3, *supra*) advised that on May 23, 2002, Detective Cooper interviewed Jarvis Henderson who advised that Henderson was, until the time of his arrest, a powder cocaine dealer and that his lone source of cocaine was defendant Workcuff. Henderson stated that he had originally been introduced to Workcuff at a McDonald's Restaurant (Workcuff's place of employment) in order to purchase marijuana. Henderson stated that he eventually began purchasing cocaine from Workcuff at his residence which he believed to be in the 3400 block of Garfield. Henderson described Workcuff's residence as the second house from the intersection, located on the west side of the street, yellow in color and having undergone extensive renovation. Henderson stated that Workcuff owned a blue Tahoe. Henderson advised that he had seen Workcuff utilize a money counting machine, which counted out approximately two-hundred thousand dollars, at Workcuff's residence. Henderson stated that approximately one week prior to the May 23 interview, Henderson had a telephone conversation with Workcuff in which Workcuff told Henderson that when Henderson was released, they would resume their narcotics relationship.

While information from Jarvis Henderson, an untested informant, standing alone, is insufficient for probable cause, it can rise to the level of probable cause when supplemented by sufficient corroboration through independent police work. *See Illinois v. Gates,* 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In addition, "statements against penal interest add to the informant's indicia of reliability, because individuals do not blithely admit to criminal activity." *See United States v. Luna,* 15 F.3d 1093, 1993 WL 522189, *2 (9th Cir. Dec.14, 1993). *See also United States v. Golay,* 502 F.2d 182, 186–87 (8th Cir.1974)(admission against penal interest provides basis for magistrate to determine that informant is credible and his information reliable). While Henderson's admission to being a participant in drug trafficking with defendant Workcuff occurred after Henderson's arrest, it still buttresses the reliability of his information. "[E]ven after arrest '[p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions.'" *Luna,* 1993 WL 522189 at *3 (quoting *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)).

The affidavit sets forth the steps taken by Detective Cooper to corroborate the statements that had been given to him by Henderson. Detective Cooper sought out the residence described by Henderson and found a residence matching its description in the 3300 block of Garfield. A check of a blue sport utility vehicle's license parked next to the residence responded back to Montonio Workcuff of 3304 Garfield. Detective Cooper checked the Street Narcotics Unit DRAGNET System which revealed two reports made on 3304 Garfield. The reports indicated that Montonio Workcuff sells drugs from the residence and that he is employed at McDonald's.

The Court finds that Detective Cooper's affidavit was adequate to support the issuing judge's determination of probable cause to search for cocaine, marijuana and currency. Judge Sauer had a substantial basis for her probable cause determination that cocaine, marijuana and currency would be found at defendant Workcuff's residence. While it can be argued that the remainder of the items sought[22] are incident to drug trafficking, support for them was not specifically set forth in the affidavit, making a determination of probable cause as to these additional items questionable. However, the Court finds that the additional items seized should not be suppressed based upon the good faith exception provided for in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which discussion is set forth *infra*.

### 3. *General Search Warrant*

█ In an argument closely related to a his lack of probable cause argument, defendant sets forth the following as support for his argument that evidence seized should be suppressed because the warrant was a general search warrant:

A search warrant must describe with particularity the item to be seized. The description of the property to be seized must be so specific that it leaves nothing to the discretion of the agents executing the warrant. *Marvin v. United States*, 732 F.2d 669, 674 (8th Cir.1984). Furthermore, the warrant must not allow

the officers to seize more than is reasonable under the circumstances. *Id.* And, "depending on the circumstance of the particular case, a warrant may be so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid. *Cf. Massachusetts v. Sheppard*, 468 U.S., at 988–991, 104 S.Ct., at 3428–3430." *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984).

The search warrant authorizes, for example, the seizure of "Any and all equipment used to further drug transactions and/or deter law enforcement effectiveness." Presumably, this general search leaves to the officer's discretion to determine whether the paper and pen near a phone might be used to write telephone numbers for drug transactions as opposed to a shopping list; whether tennis shoes might be used to run from police rather than worn to work in the yard; whether binoculars might be used for observing police rather than watching a football game.

The search warrant authorizes the seizure of "Photographs" without limitation. "A flagrant disregard for the limitations of the search warrant might make an otherwise valid search an impermissible general search and thus require the suppression or return of all evidence seized during the search."

---

**22.** These items include any weapons; any and all equipment used to further drug transactions and/or deter law enforcement effectiveness; any papers, correspondence or documents related to drug trafficking and/or the disposition of moneys which evidence the proceeds from the illicit trafficking of drugs; photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photo-graphs of co-conspirators, of assets, and/or controlled dangerous substances; indicia of occupancy, residency, ownership, management and/or control of the premises described above including, but not limited to utility and telephone bills, canceled envelopes and keys; and any and all equipment used to deter the effectiveness of law enforcement and their attempts to halt the sale/distribution/manufacture of controlled substances.

*Marvin v. United States,* 732 F.2d 669, 674–75 (8th Cir.1984).

(Defendant's Motion to Suppress at 8–9)

■ The constitutional standard for particularity of description in a search warrant is met if "the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the ... objects to be seized." *United States v. Coppage,* 635 F.2d 683, 686–87 (8th Cir.1980)(*citing Steele v. United States,* 267 U.S. 498, 503–04, 45 S.Ct. 414, 69 L.Ed. 757 (1925)).

■ The warrant contains the following description of the items to be seized:

Cocaine, a Schedule II Controlled Substance;

Marijuana, a Schedule I Controlled Substance;

Any weapons;

Currency;

Any and all equipment used to further drug transactions and/or deter law enforcement effectiveness;

Any papers, correspondence or documents related to drug trafficking and/or the disposition of moneys which evidence the proceeds from the illicit trafficking of drugs;

Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, of assets, and/or controlled dangerous substances;

Indicia of occupancy, residency, ownership, management and/or control of the premises described above including, but not limited to utility and telephone bills, canceled envelopes and keys;

Any and all equipment used to deter the effectiveness of law enforcement and their attempts to halt the sale/distribution/manufacture of controlled substances.

(*See* Fact No. 6, *supra*) This Court finds that the warrant describes with sufficient particularity the majority of items to be seized, that is cocaine, marijuana, any weapons, currency, documents related to drug trafficking or the disposition of moneys which evidence the proceeds from drug trafficking[23] and indicia of occupancy of the premises. As stated in *United States v. Wayne,* 903 F.2d 1188 (8th Cir.1990):

Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance.

*Id.* at 1195.

■ As to the remaining items, that is any and all equipment used to further drug transactions and/or deter law enforcement effectiveness and any photographs, the Court finds that these descriptions are not sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the objects to be seized. However, the Court finds that items seized pursuant to these descriptions should not be suppressed based upon the good faith exception provided for in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which discussion is set forth *infra.*

**23.** *See United States v. Coppage,* 635 F.2d 683, 687 (8th Cir.1980)(warrant found valid which authorized search for "books, records, chemical equipment, and personal papers relating to the manufacture and distribution of methamphetamine").

#### 4. Alleged Misrepresentation In Affidavit

Defendant alleges that Detective Cooper misled Judge Sauer by stating in the Affidavit/Application for Search Warrant that he had observed a blue sport utility vehicle, bearing Missouri License "289–MS2," at the residence on May 23, 2002, when the tags from the vehicle had in fact been placed on another vehicle in April. In support of the argument that the tags were not on the blue Tahoe on May 23, 2002, defendant presented his own testimony and the testimony of his aunt, Angela Banks, and a friend, Keith Scott. (*See* Fact No. 5, *supra*) Defendant also presented evidence that a woman who was driving the vehicle on which the Tahoe's tags were placed was ticketed on June 11, 2002, for driving with truck tags on a car. (*See* Fact No. 5, *supra*) Detective Cooper testified that he did not place any false information in the affidavit. (*See* Fact No. 5, *supra*)

In *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Court held that if it is shown by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." The Court must weigh the testimony of Detective Cooper that he did not place any false information in the affidavit against the testimony of defendant, his aunt and a friend. (The evidence relating to the ticket is not particularly helpful in that it only shows that the tags were on a different vehicle on June 11, 2002, more than two weeks after Detective Cooper applied for the search warrant.)

The Court finds Detective Cooper's testimony to be more credible than that of defendant and his witnesses. Therefore, defendant did not meet his burden of establishing by a preponderance of the evidence that Detective Cooper misled the judge by including information in his affidavit that he knew to be false or would have known to be false, except for a reckless disregard for the truth. However, even if Detective Cooper's statement that he observed a blue sport utility vehicle, bearing Missouri License "289–MS2," at the residence on May 23 was deemed false and excluded, the Court finds that the affidavit would still establish probable cause. The license plate number is simply not a piece of crucial evidence to the probable cause determination.

#### 5. The Oath

Defendant sets forth the following as support for his argument that evidence seized should be suppressed because Detective Cooper's application was not verified by oath or affirmation in violation of state and federal law:

> Detective Cooper's testimony was clear: no words were spoken when he presented the search warrant application. He was not sworn in by Judge Sauer. The requirement of the oath is mandatory, and the absence of the oath renders the search warrant invalid. The oath is required by the United States Constitution, 4th Amendment, the Missouri Constitution, Article I, § 15, FRCP Rule 41(c)(1), and Section 542.276 RSMo. *See U.S. v. Stefanson,* 648 F.2d 1231 (9th Cir.1981). Certainly, Missouri places a great deal of emphasis on the oath. It is required by the Constitution, Article I, § 15 and Section 542.276.3 requires an oath or affirmation and, pursu-

ant to § 542.276.10 the search warrant is *invalid* if it is not filed and verified. The oath is required under federal law, and cannot be dispensed with or given subsequently. *See U.S. v. Shorter,* 600 F.2d 585 (6th Cir.1979).

(Defendant's Response to Government's Response to Workcuff's Exhibit 28 at 30–31)(footnotes omitted)

In *United States v. Brooks,* 285 F.3d 1102 (8th Cir.2002), the Eighth Circuit Court of Appeals recently discussed the requirement of an "oath or affirmation" supporting a showing of probable cause in an application for a search warrant:

> After conducting an investigation and discovering through an informant that cocaine base was being sold from the premises in issue, Officer Chris Graves prepared an application for a search warrant along with a supporting affidavit. At the beginning of the affidavit the officer typed, "I, Chris Graves, being duly sworn depose[ ] and state[ ] as follows," and preceding the line for his signature he typed, "I have read this affidavit and the facts herein are true to the best of my knowledge." The warrant application began by stating that Officer Graves was "duly sworn," and later recited that "being duly sworn [he] depose[d] and state[d]" that he had "probable cause."
>
> The prosecuting attorney signed the warrant application, and officer Graves signed both the application and the affidavit in the presence of a notary public, whose jurat following the officer's signature on each document states, "Subscribed and sworn to me this 18 of March 2000 at 1536 p.m." Officer Graves also prepared a search warrant for the state judge's signature; the warrant indicated that the "application [was] duly verified by oath or affirmation." The officer then took the documents to a state judge, who issued the warrant....

> Prior to trial, Mr. Brooks filed a motion to suppress all evidence obtained as a result of the search ... At the hearing, Officer Graves testified to the circumstances under which the warrant was issued. On cross-examination, he stated that he did not "recall the oath the [the notary] administered" to him before he signed the affidavit and did not remember the notary having him raise his right hand and solemnly sweat "to tell the truth and nothing but the truth."

> Following the evidentiary hearing, the district court ... concluded that Officer Graves, having worked in law enforcement for eleven years, "was well aware as an experienced police officer that both the application and affidavit were under oath." The court also observed that "the nature of the documents" indicated that the officer "realized he was swearing to the truth of what he said," and determined as well that the notary who signed both the application and the affidavit "was aware that the documents were sworn to." We take these conclusions as a factual finding that Mr. Brooks intended to be under oath because his statements and actions manifested such an intention.

> \* \* \* \* \* \*

> We reject Mr. Brooks's contention that the district court had no basis for concluding that Officer Graves was under oath when he signed the warrant application and the supporting affidavit. We agree with the district court that the language that Officer Graves used in the documents, especially the repeated recitations that he was "duly sworn," quite obviously reflects his intention to be under oath. His conduct was also consistent with that intention: He took the

documents to an individual authorized to administer oaths and signed them before that individual, and he presented to a judge for signature a warrant that acknowledged that the warrant application was "duly verified by oath or affirmation." ...

285 F.3d at 1104–05.

The Affidavit/Application for Search Warrant in the case before this Court states twice on the first page that Detective Cooper is "duly sworn." (*See* Government's Ex. 1) The third page of the Affidavit/Application for Search Warrant states: "Subscribed and Sworn to me this 23 day of May, 2002, at the hour of 2:35 PM. *Margaret L. Sauer,* Judge." (*Id.*) The Search Warrant provides: "WHEREAS, on this 23 day of May, 2002 Application for Issuance of a Search Warrant and Affidavit(s) in writing, duly verified by oath or affirmation, has been filed with the undersigned Judge of this Court." (*Id.*) Like Officer Graves, Detective Cooper, intended to be under oath because his statements and actions manifested such an intention. Pursuant to the reasoning set forth in *United States v. Brooks,* 285 F.3d 1102 (8th Cir.2002), defendant's argument that evidence be suppressed because Detective Cooper's application was not verified by oath or affirmation must be denied.

### 6. *The Leon Good Faith Exception*

Aside from the no-knock issue, even if probable cause did not exist for the warrant at issue (which this Court does not believe to be the case with respect to cocaine, marijuana and currency) or if the items set forth in the warrant were too general, the *Leon* good faith exception would support the admissibility of the evidence seized pursuant to the warrant since it appears that the officers executing the warrant were acting in "objectively reasonable reliance" on a warrant issued by a neutral judge. *See United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Murphy,* 69 F.3d 237, 241 (8th Cir.1995), *cert. denied,* 516 U.S. 1153, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996). Judge Sauer found probable cause for the issuance of the warrant.

The Eighth Circuit has set forth the following with respect to exceptions to good faith reliance:

Ordinarily, a police officer cannot be expected to question a judge's probable cause determination. Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth. Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause.

*Murphy,* 69 F.3d at 241 (quoting *United States v. Gibson,* 928 F.2d 250, 253–54 (8th Cir.1991)). Stated another way, there are four "exceptions" wherein reliance upon an invalid search warrant is per se unreasonable: (1) the affiant misled the judge by including information in the affidavit that the affiant knew was false or would have known was false, except for a reckless disregard for the truth; (2) no reasonably well-trained officer could rely on the warrant, as it was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) the judge wholly abandoned his neutral and detached position and acted as a rubber stamp; or (4) the warrant itself is so facially defective that the executing officer cannot presume its validity. *See United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

With the exception of the no-knock issue, the "exceptions" to good faith reliance do not apply in this case. Contrary to defendant's arguments, the Court finds, as set forth above, that defendant has not established that Detective Cooper misled Judge Sauer nor that Judge Sauer wholly abandoned her neutral and detached position and acted as a rubber stamp. Further, the Court cannot find that the affidavit was so lacking any indicia of probable cause (other than as to the justification for a no-knock entry) or the warrant so facially defective that the executing officers could not presume the warrant's validity.

D. *The Return On The Search Warrant*

 Defendant sets forth the following as support for his argument that evidence seized should be suppressed because the search warrant was invalid pursuant to section 542.276 RSMo:

> While the general rule is that federal courts apply federal law in determining whether evidence should be suppressed, the instant search warrant is a State search warrant which is predicated upon Missouri state law. Section 542.276 RSMo provides mandatory language for the application for and issuance, execution and return of a search warrant.
>
> Section 542.276 RSMo utilizes the work "shall" sixteen times. The word "shall" is mandatory and the statute concludes [542.276.10] that a "search warrant *shall* be deemed invalid" if any one of seven requirements are not met.
>
> \* \* \* \* \* \*
>
> A search warrant "shall be deemed invalid" if it is not "executed as soon as practicable and *shall expire* if it is not executed *and* the return made within ten days after the date of the making of the application." This language requires that a search warrant be deemed

invalid if not executed *and* the return made within ten days.

> The word "shall" is mandatory. "Courts have a duty to construe statutes in their plain, ordinary, and usual sense. *Bosworth v. Sewell,* 918 S.W.2d 773, 777 (Mo. banc 1996). Where no ambiguity exists, courts cannot look to any other rule of construction. *Id.* The plain and ordinary meaning of words used in statutes is found in the dictionary. *City of Dellwood v. Twyford,* 912 S.W.2d 58, 60 (Mo. banc 1995)." The definition of "shall" states that it is "used in laws, regulations, or directives to express what is mandatory." *Webster's Third New International Dictionary* 2085 (1976). *U.S. Cent. Underwriters Agency, Inc. v. Hutchings,* 952 S.W.2d 723, 724–25 (Mo.Ct.App.1997). "As applied to time limitations, however, Missouri courts have applied a somewhat different rule of construction." *Frager v. Director of Revenue,* 7 S.W.3d 555, 557 (Mo.App.1999). "When a statute provides what results shall follow a failure to comply with its terms it is mandatory and must be obeyed; if it merely requires certain things to be done without prescribing the results that follow, the statute is merely discretionary." *Id.*
>
> The ten day requirement of Section 542.276.10(7) is mandatory since it provides a result that follows a failure to comply with its terms, i.e. the search warrant shall be invalid. The search warrant in the instant case was applied for on May 23, 2002 and the return was filed on June 5, 2002. Ignoring that the return was never made to the judge, the return was filed 13 days after the application was made.

(Defendant's Motion to Suppress at 9–11)(emphasis in original)(footnote omitted)

 Defendant's reliance on an alleged violation of a state statute to invalidate the

search warrant is erroneous. Federal, not state, law governs the admissibility of this evidence. *See United States v. Hornbeck,* 118 F.3d .615, 617 (8th Cir.1997). "The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." *Id.* (quoting *Preston v. United States,* 376 U.S. 364, 366, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964)). The *Hornbeck* court went on to explain:

> In a federal prosecution, we evaluate a challenge to a search conducted by state authorities under federal Fourth amendment standards.... A court must examine the legality of a search by state officers as if made by federal officers. We recently concluded in *United States v. Moore,* 956 F.2d 843, 847 (8th Cir. 1992), that "evidence seized by state officers in conformity with the Fourth Amendment will not be suppressed in a federal prosecution because *state* law was violated."

118 F.3d at 617.

 However, even if this Court were to analyze the issue under state law, defendant's argument would still fail. The Missouri state courts have repeatedly held that the return to a search warrant is a ministerial act and that even the total failure to file a return does not affect the validity of the search warrant itself. *See State v. Hunt,* 454 S.W.2d 555, 559–60(Mo.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 239, 27 L.Ed.2d 245 (1970); *State v. Elliott,* 845 S.W.2d 115, 120 (Mo.Ct.App. 1993); *State v. Mitchell,* 811 S.W.2d 809, 811 (Mo.Ct.App.1991); *State v. Macke,* 594 S.W.2d 300, 309 (Mo.Ct.App.1980). As set forth by the Missouri Supreme Court, the reason the failure to file a return does not invalidate the search is that:

the procedural requirements in connection with search warrants are designed to safeguard the constitutional protection against unreasonable searches and seizures. Once the magistrate had determined that probable cause for issuance of the warrant exists and the warrant is properly executed, the failure of the officer to perform some subsequent duty does not nullify his prior valid and legal acts.

*Hunt,* 454 S.W.2d at 560. *Accord United States v. Hornbeck,* 118 F.3d 615, 617 n. 4 (8th Cir.1997) ("The district court admitted the search evidence under [Rule 41] and emphasized that the search would have taken place regardless of the alleged tribal law violations because the violations primarily took place after the search.") The failure of Detective Cooper to file the return within ten days does not nullify his prior valid and legal acts.

Defendant's argument that the evidence be suppressed because the search warrant was invalid pursuant to section 542.276 RSMo must fail.

## E. *State Search Procedures*

Finally, defendant argues that evidence seized should be suppressed because state search procedures violate due process:

> A cursory review of the procedures being followed by the Circuit Court of Jackson County, Missouri and the Kansas City, Missouri Police Department demonstrates that the procedures do not comport with the 4th, 5th and 14th Amendments due process requirements. General search warrants are routinely issued, officers routinely exceed the scope of the search warrants, detailed and accurate inventories are never done, the issuing judge never reviews the return, property not listed in the search warrant is seized and/or property seized is not listed in a return.

Counsel raises federal due process violations in the procedures of the Circuit Court of Jackson County, Missouri and the Kansas City, Missouri Police Department.

(Defendant's Motion to Suppress at 11–12)

While defense counsel would apparently have this Court review the procedures of the state court and the police department with respect to search warrants in all criminal cases, this Court will only rule on the issues as they relate to defendant Workcuff's case. As set forth above, evidence seized in this case should be suppressed based on the Court's finding that the officers improperly conducted a no-knock search. The remainder of defendant's arguments do not justify suppression.

## IV. *CONCLUSION*

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting Defendant's Motion to Suppress (doc # 22).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Nov. 1, 2002.