**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael D. MURPHY, Defendant–
Appellant.**

No. 95–1623.

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1995.

Decided Oct. 31, 1995.

Nancy Graven, Federal Public Defender, Springfield, MO, argued (R. Steven, Brown, Federal Public Defender, on the brief), for appellant.

Rose A. Barber, Asst. U.S. Atty., Springfield, MO, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Michael D. Murphy appeals his convictions, for attempt to manufacture methamphetamine, use of a firearm in relation to a drug trafficking crime, and possession of machine guns, entered after conditional pleas of guilty. On appeal, he argues that the district court[1] erred in denying his motion to suppress evidence because the affidavit supporting the search warrant for his residence did not demonstrate probable cause, the warrant did not authorize a no-knock entry, and the warrant failed to specify narcotics and drug paraphernalia as objects of the search. He also argues that the district court erred in

sentencing him to consecutive sentences under USSG § 5G1.3 (1994). We affirm.

Murphy was charged with attempting to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988), use of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (1994), and possession of machine guns in violation of 18 U.S.C. § 922(o) (1994). He was sentenced to seventy-month terms on the methamphetamine and machine gun charges, concurrent to each other, but consecutive to a 1979 Missouri sentence for second-degree murder, and a consecutive sixty-month term on the firearm charge. The issues Murphy raises on appeal are fact specific, and we will state the relevant facts in the discussion of each of the issues.

### I.

Murphy argues that the "bare bones" affidavit for the search warrant was insufficient, it failed to establish probable cause, and the warrant was not saved by the good faith exception. He argues that the district court's findings of the two corroborating facts provided by the informant, namely Murphy's address and release from the Department of Corrections, were clearly erroneous. Murphy also argues that the warrant did not mention the drug-related materials.

Tracy Sparrow, a Jasper County Sheriff's Office Investigator, executed the affidavit for the warrant. After talking with an anonymous informant in his office, Sparrow contacted the prosecuting attorney, explained the information he had, and arranged for the informant to go to the prosecutor's office. Sparrow told the prosecutor that he knew nothing of the informant, but that Officer Gail Bass had recognized him. He relayed to the prosecutor what he had been told by the informant. The prosecutor then prepared an affidavit for Sparrow to sign. The affidavit states:

That I have reason to believe on the premises known as . 907 W. 5th, Joplin, Jasper County, Missouri, occupied by Michael D. Murphy in Joplin, Jasper County,

---

1. The Honorable Russell G. Clark, Senior Judge, United States District Court for the Western District of Missouri.

Missouri, there is now being concealed certain property, to wit: .22 caliber pistol with silencer, 9mm fully automatic rifle, three fully automatic AK 47 rifles, which is subject to search and seizure in that it is contraband.

That the fact tending to establish the foregoing grounds for the issuance of a Search Warrant are as follows:

I, Tracy Sparrow, was told by a confidential informant that Michael Murphy who was recently released from Department of Corrections for murder was living at 907 W. 5th in Joplin, Missouri. That he had in his possession the above items and was threatening to kill a Jew. That I have checked and found that Michael Murphy was released from the Department of Corrections in 1992 for murder and is living at 907 W. 5th in Joplin, Missouri.

The application for a search warrant and the affidavit were presented to Circuit Judge Copeland, who asked why Sparrow was using a confidential informant. Sparrow told him that the informant feared for his life if his name was used. Judge Copeland then signed the search warrant.

Following a suppression hearing, the district court concluded that the affidavit, combined with corroborated facts, was sufficient to support the warrant. As the district court stated in the suppression hearing, the affidavit at issue here is bare bones at best.[2] However, the affidavit was not uncorroborated. Officer Sparrow verified that Murphy lived in the house at 907 W. 5th and that he had been released on parole for murder in 1992.

█ We affirm the district court's denial of a motion to suppress evidence "unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made." *United States v. Bieri*, 21 F.3d 811, 814 (8th Cir.) (citing *United*

*States v. Hyten*, 5 F.3d 1154, 1156 (8th Cir. 1993)), *cert. denied,* —— U.S. ——, 115 S.Ct. 208, 130 L.Ed.2d 138 (1994).

█ The legal sufficiency of a search warrant affidavit depends upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The court issuing the search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* In addition, the Court emphasized the "value of corroboration of details of an informant's tip by independent police work," *id.* at 241, 103 S.Ct. at 2334, in making a determination based on the totality of the circumstances. *Id.* at 241–46, 103 S.Ct. at 2333–36.

█ Sparrow's independent corroboration of Murphy's release from the penitentiary and his address both provided assurances of the informant's reliability. This corroboration, together with the information in the affidavit concerning the weapons in the house, satisfies the totality of the circumstances test of *Gates*. Thus, the issuing court had reason to believe that criminal activity was occurring at Murphy's residence.

Murphy contends that *United States v. Hove*, 848 F.2d 137 (9th Cir.1988), supports his position regarding the inadequacy of the affidavit. *Hove* is inapplicable to Murphy's case. In *Hove*, 848 F.2d at 138–39, the officer's final affidavit for the search warrant did not contain any information linking Hove or the suspected criminal activity to the residence to be searched. The court held that the warrant lacked probable cause because the affidavit failed to "explain the significance or relevance of searching this particular location." *Id.* at 139.

We echo the district court's concerns regarding the bare bones nature of the affidavit. While we hold that under the particular facts of this case the affidavit was sufficient to establish probable cause, a more careful drafting of the initial affidavit by the prosecuting attorney would have simplified the issues in this case.

---

2. The district judge stated that he was bothered and shocked that the prosecuting attorney who had sufficient information to come up with a valid and sufficient affidavit presented what he did, and that the state circuit judge issued the warrant on the basis of the affidavit.

Murphy argues that the affidavit was totally lacking in probable cause. "Probable cause exists when 'there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched.'" *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir.1995) (quoting *Bieri*, 21 F.3d at 815). "We review the district court's determination of probable cause under a clearly erroneous standard, and give considerable deference to the issuing judge's determination of probable cause." *Bieri*, 21 F.3d at 815 (citing *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331).

In this case, the affidavit stated that a confidential informant had told Sparrow that Murphy, a felon released from the Department of Corrections, possessed firearms at his home at 907 W. 5th in Joplin. It is a felony for Murphy to possess the types of weapons set out in the affidavit. *See, e.g.,* Mo.Rev.Stat. § 571.020 (1994); Mo.Rev.Stat. § 571.070 (1994); 18 U.S.C. § 922(*o* ). The affidavit contained facts sufficient to establish a reasonable belief that evidence of a crime would be found in the place to be searched. *See Bieri*, 21 F.3d at 815. Thus, the state court had a substantial basis to conclude that there was probable cause for the search. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

Murphy argues that the district court's findings regarding the two corroborating facts supporting the search warrant were clearly erroneous. The affidavit stated that Murphy was "recently released from the Department of Corrections." Murphy argues that the 1992 release was not "recent." The argument is frivolous. What is significant is that Murphy was released after serving his term for murder, and thus his possession of a weapon violated the law. The nonspecific adverb "recently" is an insufficient basis for us to conclude that the finding of fact is clearly erroneous.

■ In addition, we believe that the officers executing the warrant "acted in objectively reasonable reliance on a warrant issued by a neutral magistrate." *United States v. Gibson*, 928 F.2d 250, 253 (8th Cir.1991) (citing *United States v. Leon*, 468

U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984)).

Ordinarily, a police officer cannot be expected to question a judge's probable cause determination. Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth. Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause.

*Id.* at 253–54 (citations omitted).

Nothing in the record indicates that Sparrow acted in reckless disregard of the truth when he prepared the affidavit, or that the issuing judge was not acting in a neutral and detached manner when he issued the warrant. Before issuing the warrant, the judge asked several questions, including why Sparrow had not included the name of the confidential informant in the affidavit. Accordingly, we believe that the *Leon* good faith exception supports the admissibility of the evidence in this case.

Murphy argues that the drug-related evidence should be suppressed because there was no mention of it in the warrant affidavit. He argues that the officers knew in advance they would be searching for drugs. He concludes the affidavit fails for lack of specificity, and the search was outside the scope of the warrant. The government responds by arguing that discovery of the methamphetamine lab was proper because the evidence was in plain view.

■ The plain view doctrine allows police officers to

seize evidence without a warrant when (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,' (2) the object's incriminating character is immediately apparent, and (3) the officer has 'a lawful right of access to the object itself.'

*United States v. Hughes*, 940 F.2d 1125, 1126–27 (8th Cir.) (quoting *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301,

2307–08, 110 L.Ed.2d 112 (1990)), *cert. denied*, 502 U.S. 896, 112 S.Ct. 267, 116 L.Ed.2d 220 (1991).

■ Joplin police officers gained entry to Murphy's residence under a properly issued search warrant. *See Hughes*, 940 F.2d at 1127. Upon entering the house, officers observed in plain view glass bottles, beakers, chemicals, and bottled gas in green and orange containers bearing "flammable" warning labels. Concerned that they had discovered an explosives lab, the Joplin authorities called in federal authorities, who identified the items as a clandestine methamphetamine lab. Regardless of whether the chemicals were used for manufacturing drugs or explosives, their incriminating nature as contraband was immediately apparent to officers entering the house. *See id.* The "officers had probable cause to associate the [chemicals] with criminal activity." *Id.*

The warrant to search Murphy's residence for illegal firearms provided the officers a lawful right of access to the place where the drug evidence was found in plain view. *Id.* We conclude that the drug evidence was properly seized under the plain view doctrine, and no violation of the Fourth Amendment occurred.

In conclusion, we hold that the district court did not err by denying Murphy's motion to suppress.

## II.

Murphy argues that the evidence obtained in the search of his house should be suppressed because officers failed to satisfy the "knock and announce" requirement of 18 U.S.C. § 3109 (1994).[3] The district court ruled that the no-knock entry was sufficient. We affirm.

■ When federal officers are a significant part of a search conducted pursuant to a state warrant, section 3109 applies. *United States v. Schenk*, 983 F.2d 876, 878 n. 5 (8th Cir.1993) (quoting *United States v. Moore*, 956 F.2d 843, 847 n. 3 (8th Cir.1992)). Section 3109 does not apply in cases involving state officers executing state warrants. *United States v. Smith*, 63 F.3d 956, 962 (10th Cir.1995); *United States v. Jewell*, 60 F.3d 20, 23 n. 2 (1st Cir.1995); *United States v. Baker*, 16 F.3d 854, 856 (8th Cir.1994) (declining to apply section 3109 to Des Moines police executing an Iowa warrant without the involvement of federal agents).

■ Nothing in the record indicates that federal officers participated in the initial entry and search of Murphy's residence. A Missouri Circuit Court Judge issued the warrant to search Murphy's house based on the application of the Jasper County Prosecuting Attorney and the affidavit of a Jasper County Sheriff's Office Investigator. The Joplin City Police Special Response Team executed the warrant at Murphy's residence. Federal law enforcement officers were not contacted until after local officers discovered what they initially believed might be explosives. A Drug Enforcement Administration agent testified he was not present on the evening of July 12 when the warrant was executed, but was called after execution of the warrant revealed what was believed to be a clandestine methamphetamine laboratory. Federal agents did not arrive until after local officers had entered the house and taken Murphy into custody.

Accordingly, section 3109 is inapplicable in Murphy's case. *See United States v. Johnson*, 28 F.3d 1487, 1494–95 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995). "[T]he proper standard in this case is whether the state officials complied with [Missouri] law and the Fourth Amendment...." *United States v. Moore*, 956 F.2d at 848.

The "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." *Wilson v. Arkansas*, —— U.S. ——, ——, 115 S.Ct. 1914, 1915, 131 L.Ed.2d 976 (1995). However, officers are not required to announce before every entry. *Id.* at ——, 115

---

3. 18 U.S.C. § 3109 states:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution or the warrant.

S.Ct. at 1918. "The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Id.* "[U]nder certain circumstances the presumption in favor of announcement necessarily [gives] way to contrary considerations." *Id.* For example, the common law recognized exceptions in situations involving threats of physical violence, prisoner escapes, and likely destruction of evidence. *Id.* at ——–——, 115 S.Ct. at 1918–19.

Murphy argues that, analogous to section 3109, Missouri law [4] requires officers to knock and announce before entering. Both the Missouri statute and section 3109 recognize the common law exception to the knock and announce requirement in situations involving exigent circumstances. *See State v. Parrish,* 852 S.W.2d 426, 429 (Mo.Ct.App. 1993); *United States v. Lucht,* 18 F.3d 541, 549 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994). "Exigent circumstances will excuse noncompliance with the knock and announce requirement when the officers, 'after considering the *particular* facts regarding the premises to be searched and the circumstances surrounding the execution of the warrant,' reasonably decide there is an urgent need to force entry." *Lucht,* 18 F.3d at 549 (applying section 3109) (quoting *United States v. Stewart,* 867 F.2d 581, 584 (10th Cir.1989)).

 Neither party contests that a "reasonable belief that firearms may have been within the residence, standing alone, is clearly insufficient" to justify excusing the knock and announce requirement. *United States v. Marts,* 986 F.2d 1216, 1218 (8th Cir.1993) (applying section 3109). However, exigent circumstances, excusing the knock and announce requirement, may exist when the law enforcement officers fear for their safety. *United States v. Maxwell,* 25 F.3d 1389, 1395 (8th Cir.) (applying section 3109), *cert. denied,* —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994); *Lucht,* 18 F.3d at 549.

 In Murphy's case officers testified that the neighborhood consisted of numerous houses located close to one another. The night of the search people were outside of their homes, on their porches, and walking or driving along the street.

In addition, the informant's information indicated Murphy sometimes carried a weapon, there were weapons in the house, and Murphy had threatened to kill a Jew or blow up a synagogue that night. The officers were aware of Murphy's violent past. They knew that Murphy had shot a person following an argument, and that he was on parole from a second-degree murder conviction.

Concerned for the safety of innocent bystanders, officers testified they wanted Murphy inside the house when they executed the search warrant. Because of the high-risk nature of the search, Joplin police supervisors elected to use the Special Response Team to execute the warrant. One officer testified that, as officers began to execute the search warrant, Murphy met the Special Response Team at the door, and the team entered yelling "Police department, search warrant." Another officer testified that officers were yelling "Police, police, get down, police get down."

*Wilson,* —— U.S. at ——, 115 S.Ct. at 1915, involved a search warrant where officers suspected narcotics transactions and knew one suspect "had previously been convicted of arson and firebombing." When police found the door to the house open, they entered through the unlocked screen door, while identifying themselves and stating that they had a warrant. *Id.* While the Court did not decide when unannounced entries would be reasonable under the Fourth Amendment, the Court held that in situations involving unannounced entry, law enforcement officers may establish the reasonableness of their actions. *Id.* at ——, 115 S.Ct. at 1919.

In Murphy's case, besides fearing for their own safety, officers also feared for the safety of innocent citizens in the neighborhood.

4. The Missouri statute provides: "To make an arrest in criminal actions, the officer may break open any outer or inner door or window of a dwelling house or other building, or any other enclosure, if, after notice of his office and purpose, he be refused admittance." Mo.Rev.Stat. § 544.200 (1994).

Evaluating the facts of the particular situation confronting them, the officers chose to announce their presence and enter through Murphy's screen door. Considering all of the facts known to the officers at the time of this particular search, we hold that sufficient exigencies existed to excuse the knock and announce requirement. Accordingly, we hold that the entry was reasonable under Missouri law and the Fourth Amendment.

## III.

Murphy argues that the sentences imposed upon him violated section 5G1.3(c) of the Sentencing Guidelines[5] because they were consecutive to the existing undischarged term of imprisonment he was serving as a result of his second-degree murder conviction in 1979. The district court imposed seventy-month concurrent terms for the drug trafficking and machine gun crimes, to run consecutive to any undischarged Missouri sentence. In addition, the court sentenced Murphy under 18 U.S.C. § 924(c) to a sixty-month consecutive term for use of a firearm in relation to those drug trafficking offenses.

We first deal with the sixty-month term for use of a firearm imposed under section 924(c). While Murphy argues that the sentence under this statute should be concurrent, he cites no authority to support his arguments. Section 924(c)(1) states unequivocally: *"[N]or shall the term of impris-*

*onment imposed under this subsection run concurrently with any other term of imprisonment* including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried." 18 U.S.C. § 924(c)(1) (emphasis added). The wording of the statute could not be clearer. Not only is this term consecutive to the drug charge for which Murphy was sentenced and now appeals, but also "any other term of imprisonment," which includes the second-degree murder sentence.

At the time of the offense in this case, Murphy had been released on parole for life, after serving fifteen years of a life sentence imposed by the state of Missouri on March 7, 1979 for a second-degree murder committed in 1977. He was released on parole on April 2, 1992. On July 22, 1994, following his arrest in this case, the Missouri Board of Probation and Parole issued a warrant charging Murphy with violating his parole. However, at the time of Murphy's March 10, 1995 sentencing, his state parole had not been revoked.

At the time of sentencing, after hearing arguments from counsel, the district judge first stated that Missouri law provides that the parolee shall at all times be considered confined in the legal custody of the Department of Corrections, similar to a provision in South Dakota law considered by one of our earlier cases.[6] *See United States v. French,*

---

5. Since adoption of the guidelines in 1987, section 5G1.3 has been amended four times. "Absent Ex Post Facto Clause concerns, the guidelines in effect on the date of sentencing apply." *United States v. Gullickson*, 981 F.2d 344, 346 (8th Cir.1992). We apply USSG § 5G1.3 (Nov. 1994), which was in effect at the time of Murphy's March 10, 1995 sentencing. Section 5G1.3 states:

*Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment*
 (a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.
 (b) If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense

level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment.
 (c) (Policy Statement) In any other case, the sentence for the instant offense shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense.

6. In sentencing Murphy, the district court stated:

 As pointed out by Judge Magill in the French case, South Dakota law provides that [a] parolee shall at all times be considered confined in the legal custody of the Department of Corrections, and the same provision is provided in Section 217.690.
 There is absolutely no connection between the defendant's conviction for second-degree murder and the charges in this particular case. There's absolutely no connection. There's no way they can be grouped.

46 F.3d 710, 717 (8th Cir.1995). He then stated that there was no connection between Murphy's conviction for second-degree murder and the charges in this case, and no way they could be grouped. The court held that the sentence imposed in this case should run consecutive to any undischarged term of imprisonment resulting from the second-degree murder conviction. The district judge saw no reason to make the sentences run concurrent.

■■■ We review the district court's application of the Sentencing Guidelines de novo. *United States v. Gullickson,* 981 F.2d 344, 346 (8th Cir.1992).

■■■ We are satisfied that the district court properly applied the applicable guideline in imposing the sentence. We look first to the Missouri Parole Statute which states:

A parole shall be ordered only for the best interest of society, not as an award of clemency; it shall not be considered a reduction of sentence or a pardon.... Every offender while on parole shall remain in the legal custody of the department but shall be subject to the orders of the board.

Mo.Rev.Stat. § 217.690.2 (1994).

The district court properly read this statute to state that the offender on parole remains in the legal custody of the department and subject to the orders of the board. In imposing the sentence, the district court did not specify which subsection of section 5G1.3 of the guidelines applied. We believe it evident from the district court's findings that subsection 5G1.3(a) is applicable in this case. At the time of Murphy's commission of the offenses before us, he was released on parole, and was under the legal custody of the state,

with an unreduced sentence for second-degree murder. Hence, he was serving an undischarged term of imprisonment within the meaning of subsection 5G1.3(a) of the guidelines. Under subsection 5G1.3(a), the sentence for the drug offenses must be imposed to run consecutively. The phrase in the subsection which includes work release, furlough, or escape status is inclusive in nature and does nothing to diminish the applicability of subsection 5G1.3(a) to parole.

Application Note 1 does little to add to the plain language of subsection 5G1.3(a) of the guideline, but makes clear that the court shall impose a consecutive sentence if the defendant committed the offense while "serving an undischarged term of imprisonment." USSG § 5G1.3, comment. (n.1). Murphy was serving life parole after his release, which is covered by the phrase "undischarged term of imprisonment."

■■■ Once we determine that subsection 5G1.3(a) applies, this ends the inquiry, as the structure of section 5G1.3 contains three sequential provisions.[7] Subsection 5G1.3(b) is reached only if subsection 5G1.3(a) does not apply, and subsection 5G1.3(c), a policy statement, refers to any other case, and, thus, is applicable only if subsections 5G1.3(a) and 5G1.3(b) do not govern.

The application notes to the guideline underscore the sequential nature of the three subsections. *See* USSG § 5G1.3, comment. (n.3). Because subsection 5G1.3(a) applies, it was unnecessary for the district court to reach subsection 5G1.3(b) or 5G1.3(c) in its analysis, both under the clear terms of the guideline and the application notes.

Murphy argues only that subsection 5G1.3(c) applies. At the time of sentencing,

---

... [T]he State has not revoked the defendant's parole at this point and they may very well not revoke him. I have no way of knowing.

It's my finding that in regard to the law in this particular case that the sentence imposed in this particular case should run consecutive to any undischarged term of imprisonment with the Missouri Department of Corrections.

7. Murphy contends that subsection 5G1.3(c) applies to his case. While we are unconvinced that subsection 5G1.3(c) applies to the facts of Murphy's case, we believe that the district court's

sentence was proper even under subsection 5G1.3(c). The purpose of section 5G1.3 is to provide fair incremental punishment for a defendant subject to an undischarged term of imprisonment. "Except in the cases in which subsection (a) applies, this guideline is intended to result in an appropriate incremental punishment for the instant offense that most nearly approximates the sentence that would have been imposed had all the sentences been imposed at the same time." USSG § 5G1.3, comment. (backg'd).

Murphy's counsel argued that either subsections 5G1.3(b) or 5G1.3(c) applied, but he now makes no argument that subsection 5G1.3(b) is applicable. The shortcoming of Murphy's argument is that subsection 5G1.3(c) is applicable only if subsection 5G1.3(a) and 5G1.3(b) are not, and to establish the applicability of subsection 5G1.3(c), Murphy must first demonstrate that subsections 5G1.3(a) and 5G1.3(b) do not apply. As he has made no effort to do so, his argument that subsection 5G1.3(c) is applicable collapses.

Murphy argues that because he was subject to an undischarged term of state imprisonment, subsection 5G1.3(c) should apply, and the seventy-month sentences for the drug trafficking and machine gun charges should have run concurrently with the undischarged term of state imprisonment. He contends that under subsection 5G1.3(c) the district court should have constructed a hypothetical sentencing calculation in accordance with section 5G1.2, combining the 1977 state murder conviction with the 1994 federal charges, as if they were all federal crimes being sentenced at the same time. What we have said above disposes of this argument, and makes unnecessary the construction of such a hypothetical analysis.

Murphy argues that three decisions of this Circuit, *United States v. Gullickson*, 981 F.2d at 345–48, *United States v. Haney*, 23 F.3d 1413, 1414–16 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 253, 130 L.Ed.2d 174 (1994), and *United States v. French*, 46 F.3d at 716–17, support his interpretation of this guideline and his argument. We are unpersuaded.

We first observe that in *French*, 46 F.3d at 717, the court looked to South Dakota law, providing that parolees shall be "considered confined, in the legal custody of the department of corrections." The district court in our case recognized the similarity of the South Dakota statute to the Missouri statute. The court in *French*, however, determined that French's state court perjury conviction was part of the same relevant conduct

charged in the federal fraud and perjury convictions, and that French's actions were during the same time period, in the same general geographic area, for the same purpose, involved the same farm assets, and were part of a common plan to preserve his farming operations. *Id.* Because the state and federal charges arose from the same relevant conduct, the court applied subsection 5G1.3(b). *Id.* Thus, *French* is not helpful in our section 5G1.3(a) analysis.

Murphy argues that *Gullickson*, 981 F.2d at 345–48, mandates application of subsection 5G1.3(c) and a concurrent sentence. In light of our discussion above, we do not find *Gullickson* helpful. The court's opinion in *Gullickson* is simply based on the proposition that subsection 5G1.3(c) applied. There is no discussion by the court, and evidently no argument by the government, that subsection 5G1.3(a) or 5G1.3(b) would have been applicable.[8]

Similarly, in *Haney*, 23 F.3d at 1414–16, the decision of the court dealt with interpretation of subsection 5G1.3(c), and no issue seems to have been raised as to whether subsection 5G1.3(c) applied. The court concluded that sentencing Haney for drug and firearm charges as a result of an offense in February, 1992, when combined with consideration of an undischarged state sentence Haney received in 1985, resulted in a situation where Haney would have been subject to a statutorily mandated twenty-year consecutive sentence under section 924(c). Accordingly, his consecutive sentence resulted in a lesser penalty than would have occurred had the 1985 conviction been a part of the analysis. We do not find *Haney* and its discussion of subsection 5G1.3(c) to be of help in our analysis.

We hold that the district court did not err in sentencing Murphy to seventy-month concurrent terms on the drug trafficking and machine gun charges and a sixty-month consecutive term for the firearms charge, both

8. On December 10, 1990, Gullickson pleaded guilty in South Dakota state court to passing a forged instrument, and the court suspended imposition of sentence and placed Gullickson on probation for eighteen months, which terminated on June 6, 1991. On June 22, 1991 he committed the federal crime of aggravated sexual abuse on the Yankton Sioux Indian Reservation. Since he was no longer on probation, subsection 5G1.3(a) would not have applied.

to run consecutive to any undischarged term of state imprisonment.

We affirm the judgment of conviction with the sentence imposed by the district court.