# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1810WM

_____

| | | |
|---|---|---|
| David Doran, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| | * | |
| Dennis Eckold, in his official capacity | * | |
| as President of the Board of Police | * | On Appeal from the United |
| Commissioners of Kansas City, | * | States District Court |
| Missouri; Eric Greenwell, in his | * | for the Western District |
| official capacity as a police officer | * | of Missouri. |
| of the Kansas City, Missouri Police | * | |
| Department and in his individual | * | |
| capacity; Ty Grant, in his official | * | |
| capacity as a police officer of the | * | |
| Kansas City, Missouri Police | * | |
| Department and in his individual | * | |
| capacity, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: September 10, 2003

Filed: April 6, 2004

_____

Before LOKEN, Chief Judge, HEANEY and RICHARD S. ARNOLD, Circuit
Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

At 10:00 p.m. on the evening of August 11, 1998, Kansas City police executed a warrant to search the home of David Doran for drugs and other contraband. Using a tactic called "dynamic entry," the officers announced their presence and purpose but entered the house without knocking and affording its occupants time to answer the door. Officer Ty Grant, serving as "ram officer," yelled "Police, search warrant," simultaneously hitting the front door with his ram, breaking in on the third hit. Officer Mark Sumpter as "point man" was the first officer to enter the house. Sumpter moved quickly through the living room, reached the kitchen doorway, and saw Doran running toward him pointing a handgun. Sumpter testified that he yelled "Police, search warrant, get down," and fired. Doran was shot twice, sustaining serious injuries.

Doran commenced this action under 42 U.S.C. § 1983, asserting Fourth Amendment damage claims against Officer Sumpter for use of excessive force, Officer Grant for illegal entry, Sergeant Eric Greenwell for failure to supervise Grant, and the Board of Police Commissioners of Kansas City for failure to train its officers regarding Fourth Amendment restrictions on no-knock entries and for deliberate indifference to a custom and practice of no-knock entries. Doran testified that he had been asleep when he heard the ramming. Thinking it was a break-in or a fight on his front porch, he grabbed a pistol from under his pillow, ran from his bedroom into the kitchen, saw laser lights and realized it was the police, and bent to set his gun on the floor when he was shot. Doran denied hearing an officer yell, "Police, search warrant, get down," before he was shot.

Officer Grant testified that Officer Greenwell had trained him always to ram the door at the same time as announcing a police presence. Officer Grant had never been trained to knock, nor witnessed another officer knock and announce, before ramming the door. Tr. 241-50.

-2-

After a four-day trial, the jury found in favor of Officer Sumpter on the excessive-force claim. It returned a verdict in excess of two million dollars for Doran on the illegal-entry claim against Officer Grant, the failure-to-train claim against Sergeant Greenwell, and the claims against the Board, finding that Doran's injuries were the direct result of those Fourth Amendment violations. The District Court[1] held as a matter of law, before the case went to the jury, that the facts known to the police were not sufficient to support a reasonable belief that exigent circumstances justified the no-knock entry. Judgment was entered on this verdict. The Board, Grant, and Greenwell appeal. We affirm.

I.

Kansas City narcotics detective Wesley Williamson obtained the warrant to search Doran's home on August 6, 1998. Williamson did not participate in the execution of the search warrant and did not testify at trial. The warrant and warrant affidavit were not offered into evidence and are not part of the record on appeal. The parties agree that the warrant affidavit was based on an anonymous tip, and that the warrant did not authorize a no-knock entry. Except for running a test on trash found near the Doran home and doing a spot check of the residence, no other corroborating investigation was done.

The task of executing the warrant was assigned to the Police Department's Street Narcotics Unit, a specialized unit whose primary function is to execute search warrants, usually on drug houses. Sergeant Greenwell was in charge of the Unit's entry team. Before executing the warrant, Greenwell talked with the investigating officer and reviewed the warrant and warrant affidavit. He was told of an anonymous tipster's accusations that methamphetamine was being manufactured at the Doran

---

[1]The Hon. Nanette Laughry, United States District Judge for the Western District of Missouri.

home; that the Dorans were selling crack cocaine and methamphetamine at the front door; that drugs were stored in dresser drawers throughout the house; that guns were kept in the bedroom; and that Doran's 26-year-old son Joseph lived in the house and had recently been arrested for possessing a sawed-off shotgun. Sergeant Greenwell also did a drive-by to verify the location of the house and to "determine any tactical concerns," but did no other corroborating investigation.

On the basis of this information, alleged by the informant but not well corroborated, and his experience with methamphetamine labs, Sergeant Greenwell concluded that this would be a high-risk entry and instructed his team to enter without knocking. On the evening of August 11, the entry team gathered at an assembly point a few blocks from the Doran home. Because of the hazards associated with methamphetamine labs, Greenwell arranged for a fire department pumper and an ambulance to wait at the assembly point, and members of the entry team other than Officer Grant wore respirators to reduce the risk from chemical fumes. After Sergeant Greenwell briefed the entry team, the team proceeded to Doran's house and executed the warrant. Doran was shot soon after Officer Sumpter entered the house. The police completed the search after tending to Doran, finding one ounce of marijuana but neither a methamphetamine lab nor other illegal drugs. Doran had no prior criminal convictions and was not charged with an offense as a result of the search. This lawsuit followed.

II.

The defendants argue that because the jury found that Officer Sumpter's use of force was reasonable, no proximate cause could exist against the other officers and the Board on the illegal-entry and failure-to-train claims. They argue that an act found reasonable by the jury starts anew the chain of causation. We disagree.

Both parties agree that a suit brought under 42 U.S.C. § 1983 sounds in tort. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709 (1999). Issues of causation in § 1983 suits are decided by looking to the common law. See e.g., Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir. 1994). The issue presented by the defendants is not foreign to our jurisprudence. In Trudeau v. Wyrick, 713 F.2d 1360 (8th Cir. 1983), a state prison warden was sued for violating an outside minister's First Amendment rights. The minister, a gay man, had sent an inmate a response to a personal ad and a three-dollar check. Id. at 1362. The warden, thinking the inmate was attempting to exploit the minister, turned the letter over to the prison chaplain to "handle it." Id. at 1363. The chaplain reported the incident to the monsignor who, upon discovering that the minister was gay, took an adverse employment action against him. Ibid. The minister then brought suit against the warden and won. On appeal, the warden claimed that the act taken by the prison chaplain broke the chain of causation, relieving him of any tort liability under § 1983. Id. at 1366. We did not accept the argument then, and we do not accept it now. Foreseeable intervening acts, be they lawful or unlawful, do not break the chain of causation.

"The question of proximate cause is . . . normally one for the jury." Ibid. The defendants had every opportunity to argue this issue in closing. The jury found a link between the defendants' actions and Mr. Doran's injury, and we see no reason to dispute that factual finding.

Further, we question the logic of the defendants' argument. The jury was asked whether it was reasonable for Officer Sumpter, given the circumstances he faced once inside the home, to shoot Mr. Doran. Our review of the Board's and the two officers' conduct starts at a wholly different time. It begins with the custom of disregarding the knock-and-announce rule, and specifically the disregard of the rule in the search of the Doran home, and asks whether it was foreseeable that such disregard could

result in injury to Mr. Doran. The reasonableness of Officer Sumpter's actions does not control that question.

## III.

Next, the defendants argue that the District Court erred when it ruled as a matter of law that no exigent circumstances existed. We disagree.

In Richards v. Wisconsin, 520 U.S. 385 (1997), the Supreme Court held that "the police should be required to make [a showing of exigency] whenever the reasonableness of a no-knock entry is challenged." Id. at 394-95. The burden of proving exigency "is not high." Id. at 394. Even so, there is some flesh to the burden, and we do not think the police sufficiently demonstrated that exigent circumstances existed to justify their "dynamic entry" into the Doran home.[2]

The knock-and-announce rule posits that, unless countervailing law-enforcement interests are sufficient, officers executing a search warrant at a person's home must knock and announce their presence before entering. See Wilson v.

---

[2]The defendants alternatively argue that the District Court erred by not submitting factual questions to the jury before ruling on exigency. They cite Tamez v. City of San Marcos, 118 F.3d 1085, 1094 (5th Cir. 1997), for support. We have found no case in our Circuit which adopts the Tamez test, and we do not choose to do so now, because even if we adopted Tamez, we would affirm the District Court's ruling. The District Court held that there were no relevant factual matters in dispute, and the defendants did not request that special interrogatories be submitted to the jury. Further, on appeal, the defendants point to no specific fact that they allege was disputed. We agree with the District Court that there were no factual disputes for the jury to decide on the issue of exigent circumstances, and thus find the District Court's decision to move on to the legal question proper. The issue is not whether the police believed the information in the anonymous tip. The issue is whether it was reasonable for them to believe the information in the anonymous tip.

Arkansas, 514 U.S. 927, 936 (1995), and see also United States v. Mendoza, 281 F.3d 712, 717 (8th Cir. 2002). The police can show a superseding interest by demonstrating a reasonable belief that the announcement would put them in danger, would be futile, or would inhibit effective investigation of the crime by allowing the destruction of evidence. Richards, 520 U.S. at 394. We look to the particular facts known to officers on the scene and circumstances surrounding the entry in judging whether dispensing with the knock-and-announce rule was justified. See United States v. Cooper, 168 F.3d 336, 339 (8th Cir. 1999). Thus, the burden is two-fold. The police must give a legitimate reason for doing away with the knock-and-announce rule, and there must be facts which make that concern reasonable. In the case at bar, both showings are weak.

We are not convinced that the police gave a legally sufficient reason for dispensing with the knock-and-announce rule. Officer Grant testified that exigent circumstances existed because (a) there was a "safety factor" involved in raiding drug houses, (b) there were violent, armed people in drug houses, and (c) he assumed the existence of lethal fumes from the chemicals used to produce methamphetamine. Tr. 260-61. While not directly stated, the implication behind his testimony is that the police feared for their safety because the Doran house was presumed to be a methamphetamine lab. This reasoning, if allowed, would lead to a per se exception to the knock-and-announce rule for methamphetamine labs. The Supreme Court has warned against such a result. Richards, 520 U.S. at 394 ("If a per se exception were allowed for each category of criminal investigation . . . the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless."). The Fourth Amendment preserves the right of privacy one has in one's home. To overcome that privacy expectation, the police interest should be specific to the individual and the place, not generalized to a class of crime.

This is not to say that the class of offense should have no bearing on our exigency analysis. As the Supreme Court recently noted, "[p]olice seeking a stolen

-7-

piano may be able to spend more time to make sure they really need the battering ram." United States v. Banks, 540 U.S. ___ , ____, 124 S. Ct. 521, 528 (2003). Thus, the type of crime should be considered in determining the existence of exigent circumstances, and undoubtedly methamphetamine-lab searches pose unique concerns of which we should be mindful. But in demonstrating a legitimate reason for disregarding the knock-and-announce rule, the police must provide an interest that is specific to the house they are searching, and the person who lives there – not rely on a per se presumption given the type of crime they are investigating.

Even had the police correctly framed their concern so as to state specific safety risks raised by the search of Mr. Doran's home, we are not convinced that concern was reasonable. The exigency exception to the knock-and-announce rule was meant, in part, to lessen the risks law enforcement face in dangerous situations. See Wilson, 514 U.S. at 936. It was not, however, meant to relieve officers of their obligations, in appropriate cases, to investigate before acting.[3]

---

[3]Although we have found no case directly dealing with the police obligation of investigation in exigency questions, precedent from an area of law with a similar burden of proof, Terry-stop disputes involving anonymous tips, strongly supports our position. For example, the Second Circuit has held that the information needed to give rise to reasonable suspicion for the police to do a Terry seizure of luggage must meet a high standard of reliability. United States v. Walker, 7 F.3d 26, 29 (2d Cir. 1993). In its words: "[r]easonable suspicion is dependent upon both the content of information possessed and its degree of reliability." Ibid. The Court reasoned that the disputed anonymous tip, standing alone, would generally not be reliable enough to justify a Terry stop because it lacked any indicia of reliability. Id. at 30. "However, because the police verified nearly every aspect of the tip, [the Court] conclude[d] that under the totality of the circumstances the police had reasonable suspicion. . .." Id. at 31. Similarly, the Supreme Court held in Alabama v. White, 496 U.S. 325 (1990), that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Id. at 330. In White the Court approved the disputed Terry stop because the police demonstrated significant

Here, the police supported their safety concern by pointing to the following evidence: an anonymous, uncorroborated tip that the Dorans were buying and making methamphetamine; the uncorroborated statement that the younger Mr. Doran had been arrested for illegal firearm possession; the uncorroborated statement that there were guns in the house; and drug residue in a trash bag found outside the home. Thus, there was almost no certainty to most of the information the police reportedly "knew." Had the police done even some investigation or surveillance they would have had a better understanding of whether the Dorans posed a security risk justifying a no-knock entry. Instead, they relied on very sketchy information, a reliance we find unreasonable, and outweighed by the privacy interest the Fourth Amendment is meant to protect.

In reaching our conclusion, we are mindful of the terms of our test. We judge the reasonableness of an alleged exigency based on the "facts and circumstances known to the officers" at the time of the search. Cooper, 168 F.3d at 339. Here, the police knew very few facts, and the circumstances were that they had done very little corroborating investigation. Given their failure to corroborate the anonymous tip, we hold that they did not know enough to demonstrate exigency. It was their burden to demonstrate sufficient facts to support a finding of exigent circumstances, and they failed to do so. It was entirely appropriate for the District Court to infer that no efforts at corroboration were made. The government had the burden of proof, and surely it would have shown corroboration if there had been any.

---

corroboration of the anonymous tip. Id. at 331. In our case, the police did no corroborating investigation to show that the Dorans were either selling or making methamphetamine. While the defendants point to the trash test, such evidence, at best, points to use, and certainly does not demonstrate any of the potential concerns raised by an alleged meth lab, which might, if properly developed, justify disregarding the knock-and-announce rule.

IV.

The defendants also argue that the District Court improperly admitted the testimony of expert witness Gerald Gottlieb, as it was unreliable or untrustworthy. We are not persuaded.

Mr. Gottlieb, a certified public accountant, was retained by Mr. Doran to testify on the amount of income Mr. Doran lost as a result of the shooting. To reach his conclusion, Mr. Gottlieb relied on Mr. Doran's own estimation of his reduction in work capacity and the clients he lost. Mr. Gottlieb then took Mr. Doran's pre-shooting tax returns and client invoices to estimate the dollar amount of loss. At trial, Mr. Gottlieb described his education and his roughly thirty years' experience as an accountant. He described what the plaintiffs requested him to do as "crunching numbers," and he expressly stated on direct examination that he had "no firsthand information as to what [Mr. Doran's] capacity was." Tr. 497, 501.

The defendants argue that because Mr. Gottlieb relied on Mr. Doran's "best guess" as to Mr. Doran's reduction in work capacity and not on a doctor's analysis that his testimony did not cross the threshold of reliability necessary for an expert witness. Framed as it is, the appeal questions the admissibility of Mr. Gottlieb's testimony and not his qualifications as an expert. This distinction is important. "Once the trial court has determined that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded to the expert testimony rather than to its admissibility." Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283 (8th Cir. 1995) (citations omitted). Put another way, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988). Thus, "[o]nly if an expert's opinion is 'so fundamentally unsupported that it can offer

no assistance to the jury' must such testimony be excluded." Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995).

We do not think that Mr. Gottlieb's testimony was unsupported. His mathematical calculations were derived using standard accounting procedures and based on Mr. Doran's estimation (not just a "guess"). To the extent that the jury did not believe Mr. Doran's estimation they could have reduced or eliminated their reliance on Mr. Gottlieb's testimony. But to the extent that they believed Mr. Doran's estimation, Mr. Gottlieb's testimony was certainly helpful to the jury, and it was proper for the District Court to admit it.

V.

Finally, the defendants argue that the District Court abused its discretion in denying their motion for a mistrial. Their argument on this point is two-fold. First, they argue that a mistrial should have been declared when Mr. Doran asked a witness whether he knew what "being sued in an official capacity" meant, and that his personal funds would not be used in paying any judgment rendered. The question, however, was never answered, as the defendants successfully objected. Second, the defendants argue that a mistrial should have been granted when the District Court denied their attempt to show that any verdict would be paid from taxpayer funds. We disagree.

We review a denial of a motion for mistrial for abuse of discretion. Sterkel v. Fruehauf Corp., 975 F.2d 528, 532 (8th Cir. 1992). We rarely overturn a lower court's ruling because the District Court "is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the cold record." Williams v. Mensey, 785 F.2d 631, 637 (8th Cir. 1986). We follow that maxim here, as we find the District Court's ruling reasonable. Mr. Doran's question was never answered, and any prejudicial effect caused by the mere question

was cured by the Judge's instruction to the jury that "[s]tatements, arguments, questions and comments by lawyers are not evidence." Appellant's App. at 57.

Affirmed.

LOKEN, Chief Judge, dissenting.

I respectfully dissent. My disagreement lies not with the court's articulation of Fourth Amendment principles in Part III of its opinion. Rather, I conclude on this record that the police officers sued for illegal entry, Sergeant Greenwell and Officer Grant, acted reasonably in concluding that exigent circumstances warranted *their conduct* in effecting the no-knock entry.

During the instructions conference at the close of the evidence, the district court "ruled as a matter of law that there were not exigent circumstances which permitted the waiver of the knock or wait rule, and we'll not be submitting that to the jury." As a result, the jury instructions on the Fourth Amendment claims against Sergeant Greenwell and Officer Grant virtually directed a verdict in favor of Doran on those claims. Procedurally, this exigent circumstances ruling was flawed.

The district court explained its ruling in a post-verdict opinion denying defendants' post-trial motions. The court cited the following facts as supporting its conclusion that exigent circumstances did not justify the no-knock entry: the warrant affidavit was based upon an anonymous tip that did not come from a reliable confidential informant; the tip that drug sales were occurring at the Doran house was not corroborated by a controlled buy or surveillance; the trash search uncovered drug residue, but no evidence linked the trash to Doran's house; the police did not check the criminal history of Doran and his wife, which would have revealed no prior arrests; and the allegation that Doran's son was recently arrested for possession of a

-12-

sawed-off shotgun was not verified. These facts concern what the narcotics investigators knew or should have known when the search warrant issued.

Kansas City narcotics detective Wesley Williamson obtained the warrant to search Doran's home. Detective Williamson did not testify at trial. The warrant and warrant affidavit were not offered into evidence and are not part of the record on appeal. The parties agree that the warrant affidavit was based on an anonymous tip and that the warrant did not authorize a no-knock entry. But the trial record is silent regarding the investigation that preceded issuance of the warrant. Thus, the above-summarized "facts" on which the district court relied were not established at trial. Indeed, at least one fact assertion is contrary to the discovery record, because Detective Williamson testified in a pretrial deposition that the trash search uncovered mail addressed to the Dorans at that address. While I agree that the ultimate issue of Fourth Amendment reasonableness is an issue of law, I conclude the court erred in failing to specify the record on which its ruling was based and in relying on inferences drawn from pretrial proceedings rather than on the facts proved at trial.[4]

In addition, the district court's analysis of the exigent circumstances issue was contrary to the Supreme Court's knock-and-announce decisions in two important respects. First, the district court emphasized that the police did not obtain a no-knock warrant to search the Doran home. In Richards v. Wisconsin, the Supreme Court held that a case-by-case analysis of the facts of a particular entry is required to determine if the police had "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it

---

[4]In determining "whether the Fourth Amendment has been violated by a failure to knock and announce, we must remember reasonableness is our polestar. " United States v. Mendoza, 281 F.3d 712, 717 (8th Cir.), cert. denied, 537 U.S. 1004 (2002). We review this issue of law *de novo*. See, e.g., United States v. McKines, 933 F.2d 1412, 1424-26 (8th Cir.) (en banc) (John R. Gibson, J., concurring) (stating the opinion of the court on this issue), cert. denied, 502 U.S. 985 (1991).

would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." 520 U.S. 385, 394 (1997). The Court noted that a no-knock warrant is reasonable if the issuing magistrate is presented with a sufficient showing of exigent circumstances. But it went on to hold that the no-knock entry in Richards was reasonable *even though the issuing magistrate had denied a request for a no-knock warrant.* Richards, 520 U.S. at 395-96 & n.7; accord United States v. Banks, 124 S. Ct. 521, 525 (2003) ("[E]ven when executing a warrant [that does not authorize a no-knock entry], if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in."). Thus, absent no-knock authority in the warrant, the question is whether the police had reasonable suspicion of exigent circumstances at the time they executed the warrant.

Second, the district court erred in emphasizing that the facts known to the police as they approached the Doran house were the same facts known when they applied for the warrant. To be sure, exigent circumstance cases often turn on facts that unfold as the police approach the premises to be searched, or after they initially knock. See, e.g., Richards, 520 U.S. at 388-89. But the Fourth Amendment analysis turns on the totality of the circumstances, including facts gathered by the police before they applied for the warrant. The district court's approach might well result in the police requesting no-knock authority whenever the facts recited in the warrant application might justify a no-knock entry. This would encourage excessive use of the no-knock tactic and is contrary to countless Supreme Court decisions applying the Fourth Amendment's reasonableness standard.

The court properly avoids the district court's errors of law in Part III of its opinion. But to compensate, the court errs by shifting the analysis from the conduct of the defendants, Sergeant Greenwell and Officer Grant, to the conduct of "the police." See *ante* at 7-10. Section 1983 liability is personal. It is based upon the conduct of a specific defendant acting under color of state law. Just as the sheriff sued for executing an arrest warrant on an innocent man was held not liable in Baker

-14-

v. McCollan, 443 U.S. 137, 145-46 (1979), because he was not "required by the Constitution to investigate independently every claim of innocence," so too a police officer sued for executing a search warrant improperly is not liable under § 1983 for inadequacies in the investigation that led to the warrant being issued, so long as the facts known to the defendant at the time he executed the warrant rendered *his* conduct constitutionally reasonable. Thus, in my view, this case should turn on whether the evidence established that Sergeant Greenwell and Officer Grant acted reasonably in using the no-knock method of executing the warrant to search Doran's house.

The task of executing the warrant was assigned to the Police Department's Street Narcotics Unit, a specialized unit whose primary function was to execute search warrants, usually on drug houses. Sergeant Greenwell was in charge of the Unit's entry team. Before executing the warrant, Sergeant Greenwell talked with Detective Williamson, the investigating officer, and reviewed the warrant and warrant affidavit. From this, he learned that methamphetamine was being manufactured at the house to be searched; that Doran was selling crack cocaine and methamphetamine at the front door throughout the day; that drugs were stored in dresser drawers throughout the house; that guns were kept in the bedroom; that Doran's 26-year-old son Joseph lived in the house and had recently been arrested for possessing a sawed-off shotgun; and that trash collected near the Doran home had tested positive for controlled substances. Sergeant Greenwell also did a drive-by to verify the location of the house and to "determine any tactical concerns." Based upon this information and his experience with methamphetamine labs, Sergeant Greenwell concluded that this would be a high-risk entry and instructed his team to make a dynamic entry. He selected Officer Grant to serve as ram officer for the entry. Because of the hazards associated with methamphetamine labs, Greenwell arranged for a fire department pumper and an ambulance to wait at the entry team's assembly point. Members of the team other than Officer Grant wore respirators to reduce the risk from chemical fumes. After a briefing by Sergeant Greenwell, the entry team proceeded to Doran's house and executed the warrant.

On this record I conclude that Sergeant Greenwell acted reasonably in deciding to execute the search warrant by means of a no-knock entry. From his investigation, Greenwell learned that the Doran house was suspected of harboring a clandestine methamphetamine lab. That fact has justified no-knock entries in numerous cases.[5] Consistent with these cases, Sergeant Greenwell testified at trial:

> Q. What kind of dangers do you encounter in terms of officer safety when you enter . . . what you presume to be a meth lab?
>
> A. Well, besides the obvious danger of drugs and firearms . . . you have a lot of added problems that go along with a clandestine lab. . . . The chemicals and the types of products that individuals use to manufacture methamphetamine are very volatile, combustible, ha[ve] caused explosion, fire, things of that nature. We carry specific types of equipment to help make our entry safer for us . . . and we train the [officers] to evacuate if those detectors go off that tell us whether the environment is superseding our personal protective equipment.
>
> . . . .
>
> Q. . . . [H]ave you ever been in a lab where somebody tried to destroy it?
>
> A. Yes. We've been in a situation before where suspects could flee and knock over parts of the lab. . . . Sometimes they destroy the lab in an attempt to cause harm to us on the entry team and sometimes trying to destroy evidence. . . .
>
> Q. Okay. Is there any kind of gas danger?
>
> A. Gas, there's a phosphine gas danger . . . which is highly deadly.

Greenwell also learned that ongoing drug sales had been reported and corroborated by a trash search, and that numerous weapons were thought to be kept in the house,

---

[5]See United States v. Tucker, 313 F.3d 1259, 1265-66 (10th Cir. 2002); United States v. Keene, 915 F.2d 1164, 1168-69 (8th Cir. 1990), cert. denied, 498 U.S. 1102 (1991); United States v. Spinelli, 848 F.2d 26, 29-30 (2d Cir. 1988); cf. United States v. Walsh, 299 F.3d 729, 733-34 (8th Cir.) (warrantless search authorized by public safety exigency), cert. denied, 537 U.S. 1066 (2002).

facts that also have justified no-knock entries in numerous cases.[6] Finally, he learned that Doran's son was recently arrested for possession of a sawed-off shotgun. Reasonable suspicion that an armed and potentially dangerous resident will be present has frequently justified no-knock entries.[7] The entry team conducted no surveillance to determine if the son was home or any residents were awake immediately before the nighttime entry. But if facts known prior to obtaining the warrant justify a no-knock entry, and if no contrary facts are discernable to the officers when executing the warrant, then the no-knock entry is constitutionally reasonable.

While the police bear the burden of establishing exigent circumstances, in a felony drug investigation "[t]his showing is not high." Richards, 520 U.S. at 394. In this case, the head of a team brought in to execute the warrant learned that the house to be searched was suspected of harboring a clandestine methamphetamine lab, a stash of drugs for ongoing street sales, multiple weapons, and a potentially violent resident. It was constitutionally reasonable for Sergeant Greenwell, the head of this special team, to rely on what he learned from reading the warrant documents and from interviewing the investigating narcotics officer. In explaining its contrary ruling, the district court relied on the fact that Officer Grant "routinely operated the ram as he did in this case." But Sergeant Greenwell made the decision to make the no-knock entry and assigned Officer Grant the role of ram officer. Greenwell testified that

---

[6]See Banks, 124 S. Ct. at 527; United States v. Washington, 340 F.3d 222, 227 (5th Cir.), cert. denied,124 S. Ct. 942 (2003); United States v. Gambrell, 178 F.3d 927, 928-29 (7th Cir.), cert. denied, 528 U.S. 920 (1999); United States v. Mattison, 153 F.3d 406, 410-11 (7th Cir. 1998); United States v. Singer, 943 F.2d 758, 761-63 (7th Cir. 1991); State v. Baker, 103 S.W.3d 711, 717-19 (Mo. 2003) (en banc).

[7]See United States v. Ramirez, 523 U.S. 65, 68-72 (1998); United States v. Nguyen, 250 F.3d 643, 645 (8th Cir. 2001); United States v. Gay, 240 F.3d 1222, 1228-29 (10th Cir.), cert. denied, 533 U.S. 939 (2001); United States v. Weeks, 160 F.3d 1210, 1213-14 (8th Cir. 1998); United States v. Murphy, 69 F.3d 237, 243 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996).

Grant was often given this assignment for high-risk entries. Having been briefed by Sergeant Greenwell, Officer Grant had no constitutional duty to verify that exigent circumstances attended execution of the Doran warrant before carrying out his assignment. In these circumstances, Officer Grant's testimony did not establish a Fourth Amendment violation.

Although Sergeant Greenwell and Officer Grant acted reasonably, the no-knock entry might nonetheless have been constitutionally unreasonable if the information of suspected activity came from an unreliable source and was insufficiently corroborated by the narcotics investigators. But Doran did not sue the investigating officer, Detective Williamson. Instead, the district court found from "evidence" outside the trial record that the investigation was inadequate and then used that finding to impose substantial Fourth Amendment damage liability on police officers whose own conduct was constitutionally reasonable. This was an improper extension of § 1983 liability.

For the foregoing reasons, I conclude that the Fourth Amendment claims against Sergeant Greenwell and Officer Grant should not have been submitted to the jury. And because these individual defendants did not violate Doran's constitutional rights, his failure-to-train and custom and practice claims against the Board likewise should not have been submitted. See Roach v. City of Fredericktown, 882 F.2d 294, 298 (8th Cir. 1989). Accordingly, I would reverse the judgment of the district court and remand the case with directions to dismiss the complaint.

_____